**STOCK POT RESTAURANT, INC., Appellant,**

v.

**STOCKPOT, INC., Appellee.**

**Appeal No. 84–681.**

United States Court of Appeals, Federal Circuit.

July 9, 1984.

---

1. Reported at 5 C.I.T. ——, 564 F.Supp. 826 (1983).

Ernest S. Kettelson, Joliet, Ill., argued for appellant.

Mary Helen Gallagher, Washington, D.C., argued for appellee. With her on the brief was John Vanderstar, Washington, D.C.

Before FRIEDMAN and DAVIS, Circuit Judges, and SKELTON, Senior Circuit Judge.

DAVIS, Circuit Judge.

Stock Pot Restaurant, Inc. appeals from a decision of the Trademark Trial and Appeal Board (Board or TTAB), granting the petition (Cancellation No. 13,157) of appellee Stockpot, Inc. to cancel two of appellant's registrations of "STOCK POT" for restaurant services (Registration Nos. 1,116,226 and 1,117,942). 220 USPQ 52 (1983). The ground of the cancellation was that appellee's continued use of that mark for restaurant service was prior to appellant's. We affirm.

I

Both parties to this appeal operate the same general type of restaurant, using virtually identical marks. Appellant employs "STOCK POT" in its Joliet, Illinois restaurant, while appellee has its restaurant (and gourmet shop) in Stockbridge, Massachusetts, using "STOCKPOT." Both enterprises cater to people from various parts of the country. It is agreed that the marks are confusingly similar, and, each having been used together with the representation of a kettle or pot, they evoke the same commercial impression. It is also common ground that neither party knew of the other's use of the mark until almost the time this cancellation proceeding was begun in November 1981.

Appellant applied in 1978 for registration of the two marks for "restaurant service," one for "STOCK POT" and the other for

"STOCK POT and DESIGN" (the design being the words "STOCK POT" superimposed on a kettle over a brazier), with first use claimed since November 15, 1975. Registration was allowed in 1979. Appellee does not have a registration for its mark but claims prior use continuously since March 1973. The petition to cancel appellant's registration rests on that claim of prior use. After evaluating the record, including deposition testimony from the principals of each side, the Board held appellee had made prior use of the marks, rejected appellant's dispositive factual and legal contentions, and cancelled appellant's registrations. Reconsideration was denied in an opinion.

II

Some of the major issues appellant presents to us center primarily on the Board's findings of fact, particularly that (A) appellee used its almost identical mark for restaurant services from a date prior to appellant's use; and (B) there was no interruption (as claimed by appellant) in appellee's use of the mark from May 1977 through April 1978. The Joliet company sharply challenges the Board's factual findings on those (and other) matters. This calls upon us to appraise the TTAB's factual findings to determine whether they are "clearly" or "manifestly" wrong or erroneous. *Joseph & Feiss Co. v. Joseph Kanner Hat Co., Inc.*, 337 F.2d 1014, 1015, 143 USPQ 297, 298 (CCPA 1964); *Ranney v. Bridges*, 188 F.2d 588, 596, 89 USPQ 419, 427 (CCPA 1951). *See also In re Wilder*, 736 F.2d 1516, 1520 (Fed.Cir.1984); *In re Blauwe*, 736 F.2d 699, 703 (Fed.Cir.1984). That standard governs our review of the agency's factual findings even though they are based on documentary evidence and written transcriptions of oral testimony given in depositions. *See Bose Corp. v. Consumers Union of United States, Inc.*, — U.S. —, —, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (applying the same principle to comparable Fed.R.Civ.P. 52(a)). Despite appellant's apparent position on this appeal,[1] we cannot simply decide for

1. Appellant argues the case to us as if we were the triers of the facts.

ourselves whether we would make the same factual determinations as the Board did. On the contrary, we must accept the TTAB's factual findings unless they are clearly wrong. In this case, giving the proper weight to the Board's findings, there is no ground for overturning them.

■ A. There was specific and detailed testimony (credited by the Board) from Mrs. Mitchell, appellee's principal, that appellee opened a restaurant in Stockbridge and used the mark "STOCKPOT" in connection with that restaurant in April 1973 —some two and one-half years prior to appellant's use of its mark—and that such use was continued thereafter. This testimony was corroborated by a contemporaneous restaurant guest book signed by guests, as well as by several separate advertisements for the restaurant, and by published items about the restaurant (all using the "STOCKPOT" mark). The absence of menus, signs, or photographs— from the pre-November 1975 period—showing the then use of "STOCKPOT" did not preclude the TTAB from finding such prior use, on the basis of the specific Mitchell testimony and the confirming written materials.[2] In an effort to discredit Mrs. Mitchell's testimony, appellant points out a number of alleged inconsistencies, and accuses her of false statements. We are not convinced by these assertions, singly or collectively, that her evidence was untrustworthy or that the Board could not credit it. Appellant forgets both that the trier did believe Mrs. Mitchell, and that a reviewing court must be presented with much more than a list of minor (and seemingly inadvertent) discrepancies to warrant displacing the trier's factual determinations.

B. Appellant argues that, in any event, appellee's continuous use of its mark was interrupted in 1977–1978 when the Stockbridge restaurant and the mark were leased for one year (with lessee's options to renew which were not exercised) to Sandra Phillips, at that time a key employee in appellee's restaurant. The written lease undoubtedly granted Mrs. Phillips the restaurant premises and equipment and "the exclusive use of the name 'The Stockpot Restaurant' during the term of this Lease." The Board found explicitly that Phillips actually operated the restaurant during the leased year and used the "STOCKPOT" mark.

Appellant attacks this finding as unsupported by evidence. Again, we must uphold the TTAB. Mrs. Mitchell, who was daily present in the same building and had full opportunity to observe,[3] testified fully as to the Phillips operation and that it carried on with the same menus and in the same manner as previously; in addition, Mrs. Mitchell had a joint venture, during the lease term, for advertising the restaurant together with the gourmet shop (appellee retained the latter). Only the most crabbed and one-sided reading of the evidence could possibly lead to the conclusion that the Board could not properly find the contested mark to have been used for the restaurant. It is impossible for us to overturn the Board's emphatic determination, in its opinion on reconsideration, that "We never had any doubt, based on the record, that there was continuous use by Phillips of 'STOCKPOT' for restaurant services through the period of the lease and we do not have any now."

■ C. Entwined with the lease to Mrs. Phillips is appellant's claim that appellee abandoned the mark at that time through that lease, i.e., that at best the assignment was of a "naked trademark" or was a "naked license," both signifying abandonment of rights in the mark.[4] The Board correctly interpreted the lease terms—in-

---

2. Advertisements can clearly supply proof of use of a service mark (such as involved here). *See* 15 U.S.C. § 1127 (definition of "service mark"); 1 T.J. McCarthy, *Trademarks & Unfair Competition* ¶ 16.11, at 744 (1984).

3. The restaurant was a part of a structure which contained the Mitchell home and also a gourmet shop operated by appellee.

4. The additional argument that appellant abandoned the mark through a temporary dissolution of the corporation in 1979–1982 is dealt with in Part III, *infra*.

cluding the grant to the lessee of exclusive use of the mark "The Stockpot Restaurant" during the lease term; the lessee's option to purchase the equipment and dishes, etc. plus goodwill as well as the mark, during the lease term (an option not exercised); and the restrictive covenant by the tenant not to compete for a year after the end of the lease—as *not* constituting a "naked" assignment of the mark without goodwill. 220 USPQ at 57. We agree with that discussion.

■ As for the position that the license to Mrs. Phillips was "naked"—without any control by appellant of the nature and quality of the restaurant services—the TTAB found that in fact Mrs. Mitchell exercised sufficient control throughout the one-year lease. Here, too, there was adequate evidence to sustain that finding, in (1) those lease provisions that expressly granted appellant certain rights of control; (2) Mrs. Mitchell's detailed testimony as to the general knowledge she continued to have of the restaurant's operations, and her supervision when necessary; (3) Mrs. Mitchell's close relationship to Mrs. Phillips who had previously worked as her "right hand" in the restaurant; and (4) the testimony that Mrs. Phillips used the same menus, served the same food as had appellant, and jointly advertised with Mrs. Mitchell. The Board specifically and permissibly found "not only that there was no depreciation of the quality of the restaurant services rendered during the period of the lease but that the value of the goodwill continued to increase during this period." 220 USPQ at 60. Thus, appellee continued to benefit from the use of the mark.

### III

Appellee was dissolved in January 1979 as a Massachusetts corporation after its former accountant failed to file certain required reports with the Commonwealth; this dissolution was not discovered by appellee until appellant raised that issue early in the cancellation proceeding. Appellee then cured the problem by filing the necessary reports and the corporation was reinstated by Massachusetts on September 3, 1982, by the grant of a certificate reviving the corporation. Nonetheless, appellant insists that this temporary dissolution means that, first, appellee has no authority to prosecute this cancellation proceeding, and, second, because of the interim dissolution appellee must be deemed to have abandoned the "STOCKPOT" mark.

■ The easiest answer to both contentions lies in the Massachusetts law (taken together with the undisputed fact that "there was, in fact, no cessation of activities under the 'STOCKPOT' mark" during the period of dissolution, 220 USPQ at 61). Section 108 of the pertinent state statute (Mass.Ann.Laws Ch. 156B) provides that on the filing of a revival certificate the "corporation shall stand revived with the same powers, duties and obligations as if it had not been dissolved" (except as otherwise provided in the certificate) and all corporate acts "which would have been legal and valid but for such dissolution, shall, except as aforesaid, stand ratified and confirmed." The Massachusetts Appeals Court has held, under this statute, that a revived corporation can maintain an action begun after dissolution but prior to revival. *Devlin Construction Corp. v. Driftway South Construction Corp.*, 14 Mass.App. 954, 437 N.E.2d 1069 (1982). Furthermore, by its very terms Section 108 *supra*, shows that, after revival, the corporation normally stands, with respect to the acts done during the interim period, as if it had not been dissolved. Appellant cites a statement in *Salvato v. Di Silva Transportation Co.*, 329 Mass. 305, 108 N.E.2d 51 (1952), that the carrying on of the original business of a dissolved corporation would be *ultra vires* (except for the purposes of winding up), but that statement plainly refers only to the prohibition in Section 102 of the statute against the carrying on by a dissolved (but not revived) corporation of its regular business. Appellant's revival in 1982 brought Section 108, *supra*, into play, and that provision gave retroactive effect to the revival, including the propriety of appellant's continued use of the mark.

## IV

The Board rejected appellant's motion for involuntary dismissal under Rule 41(b) of the Federal Rules of Civil Procedure,[5] a motion predicated on Mrs. Mitchell's failure to appear (after notice) at a deposition set by appellant in Illinois during its own testimony period and primarily for its own evidence.[6] The grounds for denying the motion were that it was "clearly untimely" and "not appropriate under our practice," 220 USPQ at 55 n. 7. This is said to be error.

 A trial tribunal's denial of a Rule 41(b) motion to dismiss for failure to comply with a court rule or order can be reversed on appeal only for abuse of discretion. 5 *Moore's Federal Practice,* ¶ 41.12 at 41–169, including n. 39 (2d ed. 1982). It is enough here—without passing on what is the proper TTAB practice—that the Board's determination that the motion was untimely was not an abuse of discretion. The failure of Mrs. Mitchell to appear in Illinois occurred on October 19, 1982. The record was then completed, briefs were filed by both sides, and the case was orally argued before the Board on June 15, 1983. Though the fact of Mrs. Mitchell's non-appearance in Illinois had been discussed before the Board, the motion for involuntary dismissal was not filed until June 17, 1983 (after the hearing and some eight months after Mrs. Mitchell's non-appearance). The Board certainly did not abuse its discretion in holding that such a belated motion, calling for the drastic sanction of dismissal almost at the end of the case,[7] was untimely.

## V

 We can very briefly dispose of appellant's four other points. First, there is no doubt that the Board ruled on all of appellant's claims as to the inadmissibility of certain evidence, and we have no reason to fault the Board's consideration of that evidence, especially since appellant has not shown prejudice to it from that consideration. Second, it is settled that appellant's attempt to interject the possibility of a concurrent use proceeding in connection with this cancellation proceeding is unavailing. *Rosso and Mastracco, Inc. v. Giant Food, Inc.,* 720 F.2d 1263, 1266, 219 USPQ 1050, 1053 (Fed.Cir.1983); *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1573, 221 USPQ 394, 400 (Fed. Cir.1983); *Selfway, Inc. v. Travelers Petroleum, Inc.,* 579 F.2d 75, 198 USPQ 271 (CCPA 1978). Third, appellant says that appellee has failed to prove actual pecuniary damage but it is plain that that requirement is not a prerequisite in a cancellation proceeding, but merely that the cancellation petitioner should have a "real interest" —obviously present here because appellee has long been using a virtually identical mark for the same type of restaurant service. *See International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1091–92, 220 USPQ 1017, 1020 and cases cited (Fed.Cir.1984). Fourth, it is likewise irrelevant in this cancellation proceeding that others· (without federal registrations) may possibly have been using the same mark for the same purposes. "The conflict here is between petitioner [appellee] and respondent [appellant] and not between petitioner and the world." *Krug Vins Fins de Champagne v. Rutman Wine Co.,* 197 USPQ 572, 574–75 (TTAB 1977). Cancellation may be sought and obtained if appellee has shown that it has rights superior to appellant. *See Selfway, Inc. v. Travelers Petroleum, Inc., supra,* 579 F.2d 75, 198 USPQ 271 (CCPA 1978).

For these reasons, the decision of the Board is affirmed.

AFFIRMED.

---

**5.** Appellant apparently relies on the following portion of Rule 41(b): "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him * * *."

**6.** No subpoena had been served on Mrs. Mitchell who resides in Massachusetts.

**7.** If the motion to compel Mrs. Mitchell to testify in Illinois had been timely made, and the Board had determined that she was required to testify in Illinois on mere notice, appellee would have had the opportunity to remedy the default.