**MIDWEST PLASTIC FABRICATORS, INC., Appellant,**

v.

**UNDERWRITERS LABORATORIES INC., Appellee.**

**No. 90–1043.**

United States Court of Appeals, Federal Circuit.

June 27, 1990.

---

William C. McCoy, Jr. of Pearne, Gordon, McCoy & Granger, Cleveland, Ohio, argued for appellant. With him on the brief was Stephen A. Hill.

Francis J. Higgins of Bell, Boyd & Lloyd, Chicago, Ill., argued for appellee. With him on the brief was J. William Hayton.

Before ARCHER and MICHEL, Circuit Judges, and SENTER, District Judge.*

MICHEL, Circuit Judge.

Midwest Plastic Fabricators, Inc. (Midwest) appeals the decision of the United States Patent and Trademark Office, Trademark Trial and Appeal Board (Board), denying Midwest's petition to cancel two certification mark registrations issued to Underwriters Laboratories Inc. (UL). *Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories Inc.*, 12 USPQ2d 1267 (TTAB 1989). Because the Board's findings that UL did not misuse and did

control use of its certification marks are not clearly erroneous, we affirm.

## BACKGROUND

UL, a corporation that promulgates and certifies compliance with safety standards for thousands of consumer and other products, is the owner and federal registrant of the two certification marks [1] at issue in this appeal. *See* Joint Appendix at 13–15, *Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories Inc.*, No. 90–1043 (Fed.Cir. filed Mar. 9, 1990) [hereinafter Joint App.] (Registration No. 782,589, issued Dec. 29, 1964, and Registration No. 1,102,931, issued Sept. 19, 1978). Each registration states, in part, that the certification is used by persons authorized by UL to certify that representative samplings of the goods conform to the safety standards or requirements established by UL. *Id.* A manufacturer that wishes to use the UL marks on its products to indicate compliance with UL safety standards must first submit samples to UL for testing and evaluation. Once those samples are determined to comply with UL standards, the products become eligible for listing with UL. Usually the manufacturer will enter into a listing and follow-up service agreement with UL.

This agreement provides, inter alia, that the manufacturer order UL marks through [UL] from an authorized printer; that no UL mark shall be used on products not in compliance with [UL's] requirements; that the manufacturer agrees that it will ensure that the products bearing the UL mark are in compliance with [UL's] requirements; that a testing and inspection program will be maintained by the manufacturer to assure continued compliance ...; that access to [UL's] inspectors shall be allowed

---

* The Honorable L.T. Senter, Jr., Chief Judge, United States District Court for the Northern District of Mississippi, sitting by designation.

1. A certification mark is a mark "used upon or in connection with the products or services of one or more persons other than the owner of the mark to certify regional or other origin, material, mode of manufacture, quality, accuracy or other characteristics of such goods or services...." 15 U.S.C. § 1127 (1982). The

statute defining and providing for cancellation of certification mark registrations was amended in 1988, but this case arose prior to the effective date of the amendments, November 16, 1989. *See* Trademark Law Revision Act of 1988, Pub.L. No. 100–667, 102 Stat. 3935. The Trademark Law Revision Act of 1988 is therefore not relevant to this appeal which we decide under the previous statute.

together with providing adequate facilities for the conducting of product testing and that any tests which indicate noncompliance with [UL's] requirements shall result in the manufacturer's being required to either correct the problem or remove the UL mark from the noncomplying products.

[The] follow-up service agreement provides for a periodic inspection program whereby [UL's] inspectors will visit factories and plants in which listed products are produced. If an inspector finds a variation from [UL's] requirements, a variation notice is issued ... [and] a manufacturer cannot ship products which are encompassed by the variation notice until the problem is resolved. The record shows that inspectors have discretion to allow products to be shipped with minor variations that do not affect the safety of the product. Inspectors are also authorized to remove the UL mark in appropriate situations.

[UL] exercises authority over use of the UL certification marks as described above by employing some 500 inspectors who work out of over 200 inspection centers throughout the United States. In 1987, [UL's] inspectors conducted approximately 438,000 inspections in approximately 38,900 factories and over 9 billion UL labels were issued covering approximately 12,500 different products.

*Midwest*, 12 USPQ2d at 1271.

Midwest is a manufacturer and seller of polyvinyl chloride (PVC) fittings and elbows for use with PVC conduit which encases electrical wiring. The company entered into a listing and follow-up service agreement with UL which provides, in part, that Midwest "agrees that his use of the Listing Mark constitutes *his declaration* that the products are Listed by [UL] and have been made in compliance with the requirements of [UL]." Joint App. at 1378 (emphasis added).

Midwest now seeks reversal of the Board's denial of its petition to cancel UL's registrations on the same two bases it presented to the Board. First, Midwest alleged that UL permits use of the certification marks for purposes other than certification, in violation of 15 U.S.C. § 1064(e)(3) (1982). According to Midwest, UL's president testified that application of UL's mark represents not UL's, but merely the manufacturer's declaration that the products meet UL standards. Midwest argued that the failure of UL itself to certify that the products carrying the UL mark meet UL standards demonstrates that UL permits use of the marks for purposes other than certification.

As the second basis for cancellation, Midwest charged UL fails to control the use of its marks. Specifically, Midwest alleged: (1) certain PVC elbows carrying the UL marks failed impact tests performed by its expert, Professor Charles E. Rogers, of Case Western Reserve University; and (2) certain conduit pipe manufactured by a competitor of Midwest, National Pipe Company (National), carried counterfeit UL marks. If UL fails to control its marks, the registrations are subject to cancellation under 15 U.S.C. § 1064(e)(1) (1982). Alternatively, Midwest argued to the Board that as UL fails to control use of the marks on PVC conduit, the registrations should be cancelled at least as to such conduit. UL controverted these allegations and asserted that Midwest's cancellation petition was barred by the doctrine of licensee estoppel.

## ISSUE

Whether either the Board's fact finding that UL does not use the marks other than for certification or that UL does control use of its marks is clearly erroneous.

## OPINION

### I. *Use of the Marks for Purposes Other Than to Certify*

■ We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(B) (1988).

Although our court has not previously addressed either the burden or the standard of proof in cancellation proceedings for certification mark registrations, we discern no reason to make them different than for trademark registration cancellations. *See Cerveceria Centroamericana, S.A. v.*

*Cerveceria India, Inc.*, 892 F.2d 1021, 1023, 13 USPQ2d 1307, 1309 (Fed.Cir.1989) ("[I]n a [trademark registration] cancellation for abandonment, *as for any other ground*, the petitioner bears the burden of proof. Moreover, the petitioner's burden is to establish the case for cancellation by a preponderance of the evidence.") (emphasis added).

A certification mark registration may be cancelled if the mark is not used exclusively as a certification mark. 15 U.S.C. § 1064(e)(3). For example, if a certification mark's owner also allowed the mark to be used as a trademark, there would be a basis for cancellation of the registration. *See In re Florida Citrus Comm'n*, 160 USPQ 495, 499 (TTAB 1968) ("[T]he owner of a certification mark cannot use the identical mark as a service mark or a trademark.... A certification mark should be used only to certify."); *Consolidated Dairy Prods. Co. v. Gildener & Schimmel Inc.*, 101 USPQ 465, 467 (Comm'r Pat.1954) (stating that it is incompatible to use a mark as both a trademark and as a certification mark); *see generally* J. McCarthy, *Trademark and Unfair Competition* §§ 19:32(D), at 947–49, and 20:15(G), at 1060–61 (2d ed. 1984) [hereinafter *J. McCarthy*]; E. Vandenburgh III, *Trademark Law & Procedure* § 1.40, at 40–42 (1968).

Midwest argues that UL's registrations must be cancelled because the UL certification marks are not UL's own declarations to consumers that the marked products comply with UL standards, but instead are the manufacturer's declarations.[2] Midwest asserts the failure of UL itself to make that declaration is evidence that UL "permits the use of the certification mark for purposes other than to certify" and therefore the registrations must be cancelled. *See* 15 U.S.C. § 1064(e)(3).

There is an important difference, however, between the mark's use and the user. That others test products and apply UL's certification marks simply is not probative that the marks are used for other than certification. Certainly, on this record, there is no evidence that these certification marks are used, by anyone, as trademarks or service marks. Instead, Midwest merely complains about who applies the mark to the product. Midwest in effect argues that third party application of a certification mark constitutes per se misuse—use for a purpose other than certification. But Midwest offers no authority to support such a proposition.

The statute, however, plainly does not require that, as the registrant, UL itself must test the products and declare to the public that items carrying UL marks meet UL standards. It merely authorizes cancellation of a registration if the registrant allows use of the mark for purposes other than certification. *Id.* In addition, the general practice, in accord with the statute, allows for a third party to apply the certification mark. *See* U.S. Patent & Trademark Office, *Trademark Manual of Examining Procedures* § 1306.01, at 1300–14 (1986) (The certification mark is "applied by other persons, to *their* goods or services, with *authorization* from the owner of the mark.") (emphasis added in part).

Thus, both registrations at issue here include a provision that the certification marks may be used by "persons authorized by [UL]" to indicate that "representative samplings" of the products conform to safety standards established by UL. *See* Joint App. at 13, 15 (registrations). The registrations clearly state what the marks do and do not represent to the public. The registrations certainly do not require UL to represent that UL itself tests the items.

UL agrees that UL marks, when applied by Midwest to Midwest's products, are Midwest's declaration of compliance with UL standards. The Board concluded that UL's use of the UL mark as a *manufacturer's* declaration that the marked product complies with UL standards is "a reasonable one designed to reflect the realities of the limitations involved in inspecting and certi-

---

2. As the Board noted, this cancellation petition is wholly unrelated to the question of product liability and we make no comment on the exist- ence or scope of any potential product liability of UL. *See Midwest,* 12 USPQ2d at 1275 n. 9.

fying a large number of different products. We do not find that such a statement in any way constitutes a ground for cancelling the certification marks...." *Midwest,* 12 USPQ2d at 1275 n. 9. We cannot disagree.

We review findings of fact made by the Board to determine whether they are clearly erroneous. *Cerveceria,* 892 F.2d at 1024 n. 3, 13 USPQ2d at 1310 n. 3; *Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1578–79, 222 USPQ 665, 666–67 (Fed.Cir.1984). Midwest presented no evidence to the Board that UL allowed use of its marks for purposes other than to certify that representative samplings of a product comply with UL standards. The Board's finding that UL does not use the mark for purposes other than certification thus cannot be clearly erroneous. The Board therefore correctly decided that section 1064(e)(3)'s basis for cancelling UL's registrations has not been established.

## II. *Failure to Control Use of the Marks*

■ Midwest also asserts UL does not control the use of the UL marks as required under 15 U.S.C. § 1064(e)(1), and cancellation is thus necessary. Section 1064(e)(1) provides for cancellation if the certification mark registrant "does not control, or is not able legitimately to exercise control over, the use of such mark."

The purpose of requiring a certification mark registrant to control use of its mark is the same as for a trademark registrant: to protect the public from being misled. *Cf. Haymaker Sports, Inc. v. Turian,* 581 F.2d 257, 261, 198 USPQ 610, 613 (CCPA 1978) (A trademark licensor "may license his mark if the licensing agreement provides for adequate control by the licensor over the quality of goods or services produced under the mark by a licensee. The purpose of such a requirement is to protect the public from being misled.") (citations omitted). In the case of a certification mark registrant, the risk of misleading the public may be even greater because a certification mark registration sets forth specific representations about the manufacture

and characteristics of the goods to which the mark is applied.

As the purpose of the control requirement is to protect the public, the requirement places an affirmative obligation on the certification mark owner to monitor the activities of those who use the mark. *Cf. Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 51, 171 USPQ 269, 274–75 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) ("The [trademark] licensor owes an affirmative duty to the public to assure that in the hands of his licensee the trade-mark continues to represent that which it purports to represent."); *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367, 121 USPQ 430, 437 (2d Cir.1959) (An "affirmative duty of policing [licensees] in a reasonable manner" is placed on a trademark licensor.).

To obtain cancellation of the UL certification mark registrations, Midwest has the burden to demonstrate by a preponderance of the evidence that UL failed to exercise control over use of its marks. The statute, however, does not define "control" or otherwise indicate the degree of control that it requires. Clearly, the statutory requirement cannot mean absolute control, because it would be impracticable, if not impossible, to satisfy. The Board stated: "The specific degree of control necessary in determining whether or not a certification mark should be cancelled depends, of course, on the particular facts presented in each case." *Midwest,* 12 USPQ2d at 1273. While interpretation of the statutory term "control" is a question of law which we review de novo, the Board explicated a rule of reasonableness which, because reasonableness cannot be gauged by some abstract standard, will vary depending on the particular facts. The "control" requirement of the statute means the mark owner must take reasonable steps, under all the circumstances of the case, to prevent the public from being misled.

This standard for demonstrating that a registrant has exercised control over the use of its marks is entirely consistent with the precedent of this court, which speaks in terms of "adequate control," *see Turian,*

581 F.2d at 261, 198 USPQ at 613, as well as "sufficient control," *see Stock Pot Restaurant,* 737 F.2d at 1578–79, 222 USPQ at 668. *See also Dawn Donut,* 267 F.2d at 367, 121 USPQ at 437 (where the term "reasonable" is used to delineate the type and extent of control contemplated). We believe the words "adequate" and "sufficient" used in our prior opinions are, in effect, shorthand expressions to denote a flexible standard of reasonableness based on the totality of the facts and circumstances.

We have construed the statutory requirement of "control" to mean reasonable control, i.e., such control as is practicable under all the circumstances of the case. Although interpreting the generalized meaning of the statute is a question of law, applying our construction of the statutory term "control" to the facts of a particular case is not. Both determining the facts of a particular case concerning control and the sufficiency of the control measures the registrant took to protect the public are questions of fact subject to the clearly erroneous standard of review. *See Stock Pot Restaurant,* 737 F.2d at 1578–79, 1580, 222 USPQ at 666, 668 (after discussing clear error, upholding the Board's "finding" of "sufficient control" as supported by "adequate evidence").

The Board found that UL has "a vast network of inspectors making hundreds of thousands of inspections of thousands of different products across the country" and that UL conducts comprehensive follow-up programs to ensure compliance with UL standards. *Midwest,* 12 USPQ2d at 1273. The Board also stated that UL demonstrated "considerable diligence in controlling the use of its marks; that while [the] inspection and follow-up procedures are not 100% accurate or foolproof, we know of no such requirement...." *Id.* at 1275 (footnote omitted).

Midwest relies upon two types of evidence to challenge the Board finding on control. First, it relies on the results of impact tests performed on certain conduit and elbows carrying the UL mark. The Board found the tests were not "shown to

be reliable and [are] entitled to very little, if any, probative value." *Id.* at 1274. We cannot overturn that finding as clearly erroneous because Midwest's testing of PVC conduit and elbows did not account for the age of the elbows tested or their exposure to sunlight, although it is undisputed that age and sunlight make PVC conduit brittle. *Id.* at 1274. Also, impact tests were performed on PVC elbows and Midwest concedes "that the [UL] standards for elbows do not require impact tests." *Id.* at 1273. The Board, therefore, appropriately discounted the impact tests.

The second type of evidence Midwest employs to demonstrate UL's failure to control use of its marks is the proven use of counterfeit UL marks on certain conduit manufactured by National, a competitor. The Board concluded that this limited counterfeiting problem was not sufficient to cancel UL's registrations and that UL exercised control over subsequent use of its marks by this company, based on findings about UL's responsiveness and the stringency of its corrective action. It included inspections being done solely by UL personnel and inspection of not just a "representative sampling," all that is required by the registrations, but of 100% of the conduit. *Id.* at 1274. These findings have not been shown to be clearly erroneous.

Because Midwest has not shown that the findings supporting the reasonableness of UL's control are clearly erroneous, we must sustain the Board's determination that UL's control avoids cancellation of its registrations in these proceedings.

## CONCLUSION

We hold Midwest has failed to prove either asserted basis for cancelling UL's registrations. We therefore need not, and do not, reach the remaining issues: Whether a certification mark registration may be partially cancelled for failure to control use of the mark on a single class of goods; and whether the doctrine of licensee estoppel bars Midwest's petition for cancellation. Finally, UL's request for sanctions under Rule 38 of the Federal Rules of Appellate Procedure on the ground of a frivolous

appeal is denied. The decision of the Board denying cancellation is

AFFIRMED.