Hearing:
June 3, 1997
**THIS OPINION IS CITABLE AS PRECEDENT OF THE T.T.A.B.**
Paper No. 83
EWH/TF

5-6-98



U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

Brewski Beer Co , Inc.
v
Brewski Brothers, Inc.

Cancellation No. 21,735

William R. Golden, Jr. of Kelley, Drye & Warren for Brewski Beer Co., Inc.

Richard A. Schwartz and Mark Oathout for Brewski Brothers, Inc.

Before Seeherman, Hanak and Quinn, Administrative Trademark Judges.

Opinion by Hanak, Administrative Trademark Judge:

Brewski Beer Co., Inc. (petitioner) seeks to cancel Registration No. 1,612,134 owned by Brewski Brothers, Inc. (respondent). This registration -- which issued on September 4, 1990 with a claimed first use date of December 1, 1985 and an application filing date of May 22, 1989 -- is for the mark BREWSKI BROTHERS for "sportswear, namely, pants, shirts, sweaters and jackets."

In its amended petition for cancellation dated May 4, 1993, petitioner set forth two grounds  First, petitioner alleged that long prior to any use by respondent of its alleged mark BREWSKI BROTHERS, petitioner and its predecessor-in-title continuously used BREWSKY'S as a service mark and trade name for bar services.  Petitioner noted that it owns Registration No. 1,452,668 for the mark BREWSKY'S for "bar services."  This registration issued on August 11, 1987 with a claimed first use date of April 15, 1986 and an application filing date of January 8, 1987  Continuing, petitioner alleged that respondent's "BREWSKI BROTHERS mark so resembles petitioner's name and mark BREWSKY'S, previously used, registered and not abandoned, as to be likely, when applied to the goods of the [respondent], to cause confusion, to cause mistake or to deceive."

Second, petitioner alleged that respondent "has not lawfully used the purported mark BREWSKI BROTHERS in interstate commerce for a period of more than two years duration" and that "accordingly, the mark BREWSKI BROTHERS has been abandoned and the registration should be cancelled."

Respondent filed an answer which denied the pertinent allegations of the amended petition for cancellation.  In particular, respondent made the following allegations: "There is no likelihood of confusion, mistake or deception

2

of the public between registrant's [respondent's] mark and petitioner's mark when considered in their entireties.  The marks themselves are not confusingly similar and the services [and goods] of the registered marks are non-competitive."  (Answer paragraph 11).

In addition, on October 19, 1995 this Board granted respondent's motion to file "a counterclaim for the cancellation of petitioner's pleaded Registration No. 1,452,668, on the ground of abandonment "  (Board's order page 1).  Respondent's claim of abandonment was not based on non-use  Rather, in its counterclaim, respondent pled two different types of purported abandonment of petitioner's registered mark BREWSKY'S for "bar services."  First, respondent alleged that after petitioner acquired the BREWSKY'S mark and registration from its predecessor-in-interest, it granted back to its predecessor-in-interest a license to use said mark, but that petitioner did not exercise any quality control over the use of said mark by petitioner's now licensee/predecessor-in-interest. Respondent alleged that "therefore such license is a naked license and petitioner's mark was abandoned and its registration should be cancelled."  Second, respondent alleged that the assignment from petitioner's predecessor-in-interest to petitioner of "the mark BREWSKY'S including Registration No. 1,452,668 and the alleged associated

3

goodwill was an assignment in gross" in that petitioner used the mark on "different    [bar] services" resulting in consumer misunderstanding.

Both parties to this proceeding filed briefs.  However, at the oral hearing held before this Board on June 3, 1997 only respondent was present.

The record in this case, which includes eleven depositions of approximately 1,500 pages, is summarized at pages 1-3 of petitioner's brief.  At page 6 of its brief, respondent has stated that "petitioner's summary adequately summarizes the record."

Turning to the merits of this case, as previously noted, the amended petition for cancellation sets forth "the [two] grounds of abandonment pursuant to 15 U.S C. 1127 and [priority of use and] likelihood of confusion pursuant to 15 U.S.C. 1052(d)."  (Petitioner's brief page 1).

Considering first petitioner's claim that respondent abandoned through non-use for two years its mark BREWSKI BROTHERS, petitioner has now clarified in its brief that it is petitioner's contention that "respondent's non-use and abandonment of its purported [BREWSKI BROTHERS] mark [occurred] from December 1, 1985 to March 10, 1988." (Petitioner's brief page 18).  As previously noted, respondent alleged in its application that it first used the mark BREWSKI BROTHERS on December 1, 1985.  It should be

4

noted that in its brief, petitioner has, on at least three occasions, alleged that respondent's non-use and thus abandonment of its BREWSKI BROTHERS mark occurred between December 1985 and March 1988.  For example, at page 12 of its brief, petitioner stated that "the record clearly establishes abandonment of respondent's allegedly 'used' purported mark between December 1985 and March 1988."  See also petitioner's brief page 14 where petitioner once again alleged that respondent's purported non-use of BREWSKI BROTHERS occurred "between 1985 and 1988."

Petitioner's contention that respondent's non-use and abandonment of respondent's BREWSKI BROTHERS mark occurred between December 1985 and March 1988 is significant because respondent's application to register BREWSKI BROTHERS for sportswear was not filed until May 22, 1989.  Thus, technically petitioner's claim of abandonment through non-use is legally insufficient because petitioner has not claimed that respondent failed to use its mark BREWSKI BROTHERS at any time from May 22, 1989 to the present. Stated somewhat differently, even assuming for the sake of argument that respondent abandoned its mark BREWSKI BROTHERS from December 1985 to March 1988, respondent's registration of BREWSKI BROTHERS for sportswear could not be challenged on the basis of this earlier period of purported abandonment inasmuch as the application to register said mark was not

5

filed until later, that is, until May 22, 1989.  See Income Tax Service Co. v Fountain, 475 F 2d 655, 177 USPQ 388, 389 (CCPA 1973)("We do not find appellant's argument based upon abandonment to be appropriate since all of the facts which allegedly resulted in appellee's having abandoned the mark took place prior ")  See also 2 J McCarthy, McCarthy on Trademarks and Unfair Competition, Section 17:4 at page 17-5, footnote 2 and Section 18·18 at page 18-28 (4th ed 1998).

Hence, because petitioner has not alleged that respondent did not use its BREWSKI BROTHERS mark at any time from May 22, 1989 (the filing date) to the present, petitioner's claim of abandonment must be resolved in favor of respondent.  Moreover, as discussed below, we find that the record establishes that respondent has made continuous use of its mark from December 1985 to the present

Turning to petitioner's second ground for cancellation, namely, priority of use and likelihood of confusion pursuant to Section 2(d) of the Lanham Trademark Act, it should be noted that petitioner's efforts to establish that respondent abandoned its BREWSKI BROTHERS mark from December 1985 to March 1988 were not "wasted."  If petitioner had established that respondent did not make use of its mark BREWSKI BROTHERS in December 1985 and in 1986, then petitioner also would have established that priority of use rested in its

favor because petitioner's predecessor-in-interest and petitioner collectively used the mark BREWSKY'S for bar services continuously from December 1, 1986 to the present.

To elaborate somewhat, petitioner's predecessor-in-interest (Swiatoslaw Kuziw) testified that he first used the BREWSKY'S service mark and trade name for a bar in New York City on December 1, 1986. (Kuziw dep page 5). While Mr. Kuziw testified that "the planning for that, to reach that moment [December 1, 1986], though, took about two years," he further acknowledged that he placed no advertisements for BREWSKY'S tavern prior to December 1, 1986 (Kuziw dep. pages 5 and 51). Indeed, Mr. Kuziw was quite specific in stating that "the first ad [for BREWSKY'S tavern] was in the Village Voice. The month we opened. It was in December [1986]." (Kuziw dep. page 48). Thus, while petitioner's Registration No. 1,452,668 for BREWSKY'S for bar services (which registration petitioner purchased from Mr. Kuziw on December 9, 1992) alleges a first use date of April 15, 1986, it is clear that petitioner's earliest proven first use date is December 1, 1986. It should be noted that in its brief, petitioner never claimed that its predecessor-in-interest used BREWSKY'S for bar services as early as April 15, 1986. Rather, petitioner merely made the vague statement that its "BREWSKY'S mark is now and since 1986 has been used in connection with bar services in interstate

7

commerce in the United States." (Petitioner's brief page 3).

Given that petitioner has established that it first used through its predecessor-in-interest BREWSKY'S for bar services continuously since December 1, 1986, we now shift our focus to ascertain whether respondent has established that it made continuous use of its mark BREWSKI BROTHERS from a time prior to December 1, 1986. If respondent can establish that it did so, then petitioner's Section 2(d) claim must fail because petitioner has simply not proven the first prong of any such claim, namely, priority of use While it is true that petitioner owns a registration for BREWSKY'S, by the same token, respondent owns a registration for BREWSKI BROTHERS. Hence, unlike in an opposition proceeding where the opposer may own a registration and applicant, of course, does not, we are confronted here with a situation where both parties own registrations Under such circumstances, it is the Board's practice "to hold that [as a practical matter] a petitioner, whether a registrant or not, must, in the first instance, establish prior rights in the same or a similar mark and the respondent in turn can defeat the petitioner's claim of damage by establishing that, as between the parties, it possesses [prior] superior rights in the mark sought to be cancelled." United States Mineral Products v GAF Corp., 197 USPQ 301, 305 (TTAB

1977). See also 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition Section 20:18 at page 20-39, footnote 3 (4th ed. 1998) and Pamex Foods, Inc. v Clover Club Foods, Inc., 201 USPQ 308, 313 (TTAB 1978) ("Thus, the Board has taken the position, in essence, that the registrations of each party offset each other, that petitioner as a plaintiff, must, in the first instance, establish prior rights in the same or similar mark ").

Of course, petitioner or respondent may rely on its registration for the limited purpose of proving that its mark was in use as of the application filing date. Thus, a petitioner -- whose application filing date was earlier than respondent's application filing date -- could take its chances and elect to make of record simply a copy(s) of its registration. Trademark Rules 2 122(d)(1) and 2.122(d)(2). By so doing, petitioner's proven first use date of its mark would then be the filing date of the application. However, if respondent thereafter proved an actual first use date pre-dating petitioner's filing date, the issue of priority, and hence petitioner's Section 2(d) claim, would be resolved in favor of respondent.

We turn now to a consideration of when respondent first used its mark BREWSKI BROTHERS on sportswear. As previously noted on more than one occasion, in its application which

matured into Registration No. 1,612,134, respondent alleged that said use commenced on December 1, 1985.

In May 1985 three friends -- Tom Flavin, Trey Litel and Jerry Goen -- had discussions in Houston, Texas and Ventura, California about forming a business to market to beer drinkers products bearing the words BREWSKI BROTHERS and a beer mug design. These three individuals, all in their early twenties, had come to know each other as a result of attending the same high school in Lake Charles, Louisiana. At this high school, there were a group of friends who were known as the BREWSKI BROTHERS. The three friends -- or "the three amigos" as petitioner disparagingly refers to them (petitioner's brief page 9) -- decided that their first product would be a shirt that in lieu of having a designer logo would instead have the words BREWSKI BROTHERS and the depiction of a beer mug. As Mr Litel explained, "we felt it strange that everyone would walk around with a polo horse on their shirt having never played polo or gone to a polo match; and we felt that something as common as a beer mug would be a lot more attractive to folks, because there are a lot of beer drinkers." (Litel dep. pages 33-34). Jerry Goen, a graphic artist who graduated from the Art Institute of Houston, prepared during the summer and fall of 1985 prototype shirts and hangtags. These early shirts did not have affixed to them the BREWSKI BROTHERS mark, but rather

simply had the beer mug logo affixed   On the other hand, the hangtags had both the BREWSKI BROTHERS word mark and the beer mug logo.

In a letter dated October 28, 1985, Trey Litel wrote to Colin's Import in Los Angeles to have produced in the Philippines a couple of dozen shirts and beer mug logos (Litel exhibit 3)   Attached to this letter was a "Letter of Responsibility" which read, in part, as follows:   "This letter is an agreement between Colin's Import and Brewski Brothers, Inc. concerning original artwork   The artwork being used for the patch and tag is the private property of Brewski Brothers, Inc.   The original finished artwork will be returned to Brewski Brothers, Inc. after it has been used to set-up the manufacturing processes "  This "Letter of Responsibility" was signed by Colin Chow on behalf of Colin's Import and by Trey Litel on behalf of respondent Brewski Brothers, Inc.

At the same time that the three friends were having prepared shirts with hangtags bearing the BREWSKI BROTHERS mark, they were also in the process of establishing Brewski Brothers, Inc. as a Louisiana corporation.   In the fall of 1985, the three friends each made an initial contribution of $1,000 to be used to establish their business.   Later, they retained the services of an attorney in Lake Charles to commence the incorporation process.   In a letter dated

11

October 30, 1985 the Secretary of State of the State of Louisiana wrote to this attorney informing him that the following corporate name had been reserved as he had requested· Brewski Brothers, Ltd.  (Litel exhibit 6).  On December 16, 1985 the attorney for the three friends filed with the Secretary of State articles of incorporation for Brewski Brothers, Inc.  (Litel exhibit 7).  The Secretary of State issued a formal certificate of incorporation for Brewski Brothers, Inc. on January 7, 1986.  (Litel exhibit 7).

In late December 1985, the three friends made their first sales of BREWSKI BROTHERS shirts "to a few of [their] friends that [they] grew up with."  (Litel deposition page 40).

In 1986 Brewski Brothers, Inc. sold approximately "two or three dozen shirts."  (Litel dep  page 60).  These shirts had attached to them hangtags bearing the mark BREWSKI BROTHERS.  (Litel dep. page 64).  There is some ambiguity as to precisely who were the purchasers of respondent's BREWSKI BROTHERS shirts in 1986.  There is no dispute that sales were made to family and friends of Tom Flavin, Trey Litel and Jerry Goen.  However, both Tom Flavin and Trey Litel testified that during 1986, respondent Brewski Brothers, Inc. also sold BREWSKI BROTHERS shirts to "people we came in contact with" (Flavin dep. page 36) and "people that we knew

that we felt were influential, that we could get them to buy our shirts, wear them, and get a lot of talk value around " (Litel dep. page 60).  Much of this ambiguity stems from the fact that the depositions of Tom Flavin, Trey Litel and Jerry Goen were not taken until 1996, some ten years after the original late 1985 and 1986 sales of BREWSKI BROTHERS shirts.  It is true that during the cross-examination portion of Mr. Flavin's testimony deposition, the following question and answer series occurred.  "Question:  1986, you were talking about sales were made to family and friends. Do you recall who else, if anyone, purchased Brewski Brothers shirts in 1986?  Answer·  No, I don't."  From this question and answer series, petitioner makes the following allegation at page 12 of its brief:  "Flavin admitted that no one other than family members and friends purchased respondent's shirts in all of 1986.  (Flavin dep. page 217)."

We find that the aforementioned question and answer series simply does not support petitioner's contention that Mr  Flavin admitted that in 1986 no one other than family members and friends purchased respondent's BREWSKI BROTHERS shirts.  Rather, at most it simply demonstrates that in 1996 Mr. Flavin simply could not remember the names of other 1986 purchasers of BREWSKI BROTHERS shirts  Moreover, it must be remembered that Mr. Flavin's May 6, 1996 deposition was

13

quite lengthy. According to the transcript, it commenced at 9:05 in the morning and concluded at 8 15 in the evening. Given the length of his deposition and the fact that he was attempting to recall events which occurred ten years earlier, we are not at all surprised that Mr. Flavin was unable to recall those individuals (other than family and friends) who purchased BREWSKI BROTHERS shirts in 1986.

Subsequently, Brewski Brothers, Inc sold approximately 500 BREWSKI BROTHERS shirts in 1987 and approximately 1,000 BREWSKI BROTHERS shirts in 1988. (Litel dep. pages 76 and 105). Most of the sales in 1987 and early 1988 were made on the streets of Venice Beach, California to strangers, although some of these "strangers" were celebrities, such as Jim Plunkett (a former NFL quarterback) and Buddy Hacket (who was actually given a BREWSKI BROTHERS shirt for promotional purposes). (Litel deposition page 68). Moreover, in addition to these street sales, in 1988 Brewski Brothers, Inc. commenced sales of their BREWSKI BROTHERS shirts to retail establishments such as Manhattan's Finest and Mac's Liquor. (Flavin dep pages 47 and 50) Respondent's sales of BREWSKI BROTHERS shirts totaled approximately 700 to 1,000 in 1989, and approximately 1,000 in 1990. (Litel dep. pages 115 and 124).

As previously noted, respondent filed its application to register BREWSKI BROTHERS for sportswear on May 22, 1989.

As petitioner itself acknowledges, "for applications filed prior to November [16], 1989, the quantum of initial use of a mark needed to support a federal registration had to amount 'to more than a mere sham attempt to contrive, [but] less than a bona fide commercial transaction '" Petitioner's brief page 30 citing 2 J. McCarthy, McCarthy on Trademarks and Unfair Competition Section 19:114 at 19-192 (4th ed. 1998). It is petitioner's position that respondent's early sales were "sham transactions" and that "during more than two years following [respondent's] asserted date of first use of December 1, 1995 [sic 1985], respondent Brewski Brothers, Inc. did not engage in a bona fide sale of any goods bearing the purported BREWSKI BROTHERS mark." (Petitioner's brief pages 34-35).

We find that none of respondent's sales of BREWSKI BROTHERS sportswear was a sham transaction, including even those in December 1985. Obviously, respondent was a small entity with an initial capitalization of only $3,000. Its principals were young men in their early twenties. Under such circumstances, it is quite natural that many of the early sales in 1985 and 1986 would be made to family and friends. However, the record demonstrates that commencing at least as early as 1986, respondent also sold BREWSKI BROTHERS sportswear to strangers  Under the pre-November 16, 1989 use standards required to file a federal trademark

15

application, respondent's sales activities were clearly sufficient in that they were bona fide transactions and not sham transactions. Indeed, given the fact that at all times during this proceeding respondent was a small corporation, we find that in this context, respondent's sales activities in 1986 and later constituted "bona fide use of a mark in the ordinary course of trade," the standard of use in effect from November 16, 1989 to the present. Lanham Trademark Act section 45 (15 U.S.C. 1127).

We would also point out that there is no suggestion whatsoever of any bad faith on the part of respondent in adopting its BREWSKI BROTHERS mark. It must be remembered that petitioner's predecessor-in-interest did not open its tavern under the mark BREWSKY'S until December 1, 1986, and that when it did so, it opened its tavern in New York City, a location quite distant from California, Texas and Louisiana where respondent's principals were located. Therefore, it is obvious that respondent's sales of BREWSKI BROTHERS sportswear in December 1985 and 1986 were not a scheme on the part of respondent to outrace petitioner's predecessor-in-interest to the Patent and Trademark Office because petitioner's predecessor-in-interest did not even commence operations until a year later in December 1986.

Before leaving the question of priority of use, we wish to comment upon the fact that petitioner has noted that (1)

16

respondent claimed a first use date of December 1, 1985 in its application despite the fact that respondent corporation "did not even exist until January 7, 1986" (petitioner's brief page 11), and that (2) respondent's "corporate charter was suspended by the State of Louisiana on November 19, 1990 and was not reinstated until well after the instant proceeding was instituted." (Petitioner's brief page 28). Two comments are in order

First, even if we were to limit respondent's first use date to January 6, 1986 when the Secretary of State issued its formal certificate of incorporation, respondent would still have priority of use over petitioner whose predecessor-in-interest did not commence use of BREWSKY'S for bar services until December 1, 1986. Furthermore, while respondent's corporate charter did lapse in 1990, it was revived in 1993 retroactively to 1990. See Stock Pot Restaurant, Inc. v. Stockpot, Inc , 737 F.2d 1576, 222 USPQ 665, 668 (Fed. Cir. 1984).

Second, and of greater importance, is the fact that respondent, whether as a corporation or as a three-person partnership, has continuously existed since at least December 1985, if not earlier. Respondent has continuously sold BREWSKI BROTHERS sportswear from December 1985 to the conclusion of the testimony period in this case. Thus, the use of BREWSKI BROTHERS by Tom Flavin, Trey Litel and Jerry

17

Goen prior to January 6, 1986 would inure to the benefit of respondent. Likewise, even if respondent's corporate charter had not been reinstated in 1993 retroactive to 1990, use of the BREWSKI BROTHERS trademark by these three individuals would again inure to the benefit of the respondent corporation when its charter was reinstated in 1993. WMA Group Inc. v. Western International, 29 USPQ2d 1478, 1479 (TTAB 1993). See also 2 J. McCarthy, McCarthy on Trademarks and Unfair Competition, Section 16:36 at pages 16-46 to 16-47 (4th ed. 1998).

Having found that petitioner has failed to prove the first of the two prongs of its Section 2(d) claim, that is to say, priority of use, we could elect to not consider whether there exists a likelihood of confusion resulting from the contemporaneous use of BREWSKI BROTHERS by respondent for sportswear and BREWSKY'S by petitioner for bar services. However, in order to decide all issues before us, we choose to consider the likelihood of confusion issue.

Obviously, the first word in respondent's two word mark (BREWSKI BROTHERS) is extremely similar to petitioner's mark (BREWSKY'S). However, the presence of the word BROTHERS in respondent's mark is a distinguishing element. Moreover, there are differences between respondent's goods (sportswear) and petitioner's services (bar services) While it is true that respondent's apparel features a beer

18

motif, and while it is also true that bars sometimes place their names on various apparel items (Saemann dep page 54), nevertheless, there is a clear distinction between apparel and bar services.

However, of great importance with regard to the issue of likelihood of confusion is the fact that as applied to bar services, petitioner's mark BREWSKY'S is, at a minimum, very highly suggestive and thus is entitled to a very narrow scope of protection. The word "brewski" is defined as meaning "beer." This meaning of the word "brewski" has existed since at least 1978 when it was used on the Saturday Night Live television program appearing on NBC. Random House Historical Dictionary of American Slang (1994). Thus, long prior to the adoption of the mark BREWSKY'S by petitioner's predecessor-in-interest in December 1986, the word "brewski" had existed as a slang term for "beer." Obviously, the words "beer" and "brewski" as applied to bar services (the services set forth in petitioner's pleaded registration) are highly descriptive of said services. Petitioner's predecessor-in-interest (Mr. Kuziw) simply took the highly descriptive word "brewski" and changed the final letter and placed the word in the possessive form. Indeed, Mr. Kuziw was well aware of the Saturday Night Live television program. He testified that "the entire cast of

Saturday Night Live" came in to his BREWSKY'S tavern in New York City. (Kuziw dep page 10).

Moreover, petitioner's president and owner (Sandy Saemann) also selected the name BREWSKI for his restaurant and brew pub in Los Angeles. Mr. Saemann acknowledged that he "didn't invent the name {BREWSKI}." (Saemann dep page 10). Rather, Mr. Saemann testified that around 3:30 in the afternoon each day, the crew that was building his home would leave the job site saying: "We're going to have a brewski." Mr. Saemann further testified that he thought to himself, after hearing the construction workers, as follows: "Could it be that no one has ever capitalized on this word [brewski] in the beer industry?" (Saemann dep. page 10). Finally, Mr. Saemann testified that over the years he has depicted the first word of his trade name both as BREWSKI and as BREWSKY, and that the two are so similar that "you don't know if it's with a 'Y' or an 'I'." (Saemann dep. page 10).

It has been noted that "the mere presence of a common, highly suggestive portion [word] is usually insufficient to support a finding of likelihood of confusion." Tektronix, Inc. v Daktronics, Inc., 534 F.2d 915, 189 USPQ 693, 694 (CCPA 1976) In this particular case, the base word (brewski) which is common both to petitioner's and respondent's marks is not merely highly suggestive of bar

20

services, but indeed "brewski" is highly descriptive of bar services.  Accordingly, we find that there exists no likelihood of confusion resulting from the use of BREWSKY'S for bar services and BREWSKI BROTHERS for apparel.

We now turn to a consideration of respondent's counterclaim that petitioner has abandoned its BREWSKY'S mark.  As earlier noted, on December 1, 1986 Mr. Kuziw opened BREWSKY'S tavern in lower Manhattan.  The BREWSKY'S tavern in lower Manhattan has been in continuous operation since December 1, 1986.  BREWSKY'S tavern has always specialized in having hundreds of different brands of beer available.  On the other hand, BREWSKY'S tavern has always had a limited selection of food items.

On January 8, 1987 Mr. Kuziw applied to register BREWSKY'S for "bar services."  The result was the aforementioned Registration No. 1,452,668 which issued on August 11, 1987.

Switching coasts for a moment, in 1991 Mr. Saemann, a resident of El Segundo, California, incorporated petitioner Brewski Beer Co., Inc. -As noted, Mr. Saemann is the president and owner of petitioner.  Mr. Saemann went to high school, college and graduate school in southern California. As previously noted, Mr. Saemann stated that he came up with the name BREWSKI or BREWSKY from overhearing workers on his house say:  "We're going to have a brewski.".  Subsequently,

21

Mr. Saemann had his lawyer conduct a trademark search and as a result learned of BREWSKY'S tavern in lower Manhattan and Mr Kuziw's registration of BREWSKY'S for bar services To make a long story short, on December 9, 1992 Mr. Saemann, working with a New York City attorney (petitioner's attorney of record in this case), purchased on behalf of petitioner Mr. Kuziw's Registration No 1,452,668 for BREWSKY'S and the goodwill associated therewith On that same date, petitioner then licensed back to Mr. Kuziw the right to use the BREWSKY'S mark in connection with the operation of a bar and restaurant located at 41 East 7th Street, New York City.

Subsequently, petitioner began brewing and selling in California BREWSKI beer. In addition, petitioner also opened a restaurant and microbrewery (brewpub) in Hermosa Beach called BREWSKI'S. Hermosa Beach is another coastal community in the greater Los Angeles area located not far from Venice Beach and El Segundo.

BREWSKI'S restaurant and microbrewery in Hermosa Beach (Los Angeles) and BREWSKY'S tavern in lower Manhattan (New York City) are quite different in a number of respects. First, the New York City tavern is noted for carrying a wide selection of beers. During its existence, it has carried at the same time anywhere from two hundred to four hundred different brands of beer In contrast, BREWSKI'S restaurant and microbrewery in Hermosa Beach carries only BREWSKI beer

and a few other brands. Second, BREWSKY'S tavern in New York City offers a very limited selection of food items. In contrast, BREWSKI'S restaurant and microbrewery in Hermosa Beach offers a large selection of food items on its menu. Finally, in terms of atmosphere, the two establishments are quite different. BREWSKY'S tavern is cozy and nostalgic, with small tables to maximize space, sawdust on the floor and beer memorabilia and pictures of celebrities on the walls. Moreover, BREWSKY'S tavern in lower Manhattan has antique bar furniture dating to 1882. Mr. Kuziw explained the reason for this "antique look" was due to the fact that "McSorley's Old Ale House is just around the block [from BREWSKY'S tavern], it has been around since 1895, the oldest ale house in New York. I [Mr. Kuziw] installed an old antique bar to make their customers who couldn't get in [to McSorley's] to come into our place and feel comfortable." (Kuziw dep pages 57-58). In contrast, BREWSKI'S restaurant and microbrewery in Hermosa Beach has a modern look, with somewhat of an "industrial" atmosphere due to the fact that the microbrewery is on the premises of the restaurant.

As previously noted, respondent's counterclaim that petitioner has abandoned rights to the BREWSKY'S (spelled with a "y") mark and registration has two prongs First, respondent alleges that "the [BREWSKY'S] mark was effectively abandoned when [petitioner] granted a license to

23

Kuziw without exercising adequate quality control. Failure to exercise reasonable control of a licensee results in abandonment of the mark " (Respondent's brief page 48) Second, respondent alleges that petitioner has abandoned its BREWSKY'S mark and registration because the transfer from Mr. Kuziw to petitioner was "in gross" and because "there is no question that Brewski's Restaurant [in Los Angeles] and Brewsky's Tavern [in New York City] are completely different in all respects and public deception will result." (Respondent's brief page 50).

Respondent's claim that petitioner failed to exercise quality control over the operations of BREWSKY'S tavern in New York City is not supported by the record. Petitioner frequently inspected the operations of BREWSKY'S tavern; Mr. Kuziw frequently reported to petitioner concerning the operations of BREWSKY'S tavern; and Mr. Kuziw cleared in advance with petitioner any significant changes to the operations of BREWSKY'S tavern, such as when a decision was made to expand the physical size of BREWSKY'S tavern. Moreover, the record demonstrates that at all times BREWSKY'S tavern in lower Manhattan has been operated to high standards and has continued to receive favorable publicity. As Mr Saemann testified with regard to the operations of BREWSKY'S tavern in lower Manhattan, "I find very little to want to control or change It's quite a

success." (Saemann dep. page 21). There is nothing in the record to suggest that the services rendered to the public at BREWSKY'S tavern in lower Manhattan were in any way whatsoever unsatisfactory. Even if we were to assume that petitioner exercised no quality control over the operations of BREWSKY'S tavern (when in fact, petitioner clearly did), nevertheless, "the inference of abandonment is not drawn [where] satisfactory quality was maintained, and, hence, no deception of purchasers occurred " Stockpot, Inc. v. Stock Pot Restaurant, Inc., 220 USPQ 52, 59 (TTAB 1983), aff'd 737 F.2d 1576, 222 USPQ 665 (Fed. Cir. 1984)

As previously noted, respondent has articulated the second prong of its abandonment counterclaim ("assignment in gross") in the following manner· "There is no question that Brewski's Restaurant and Brewsky's Tavern are completely different in all respects and public deception will result " (Respondent's brief page 50). Even assuming for the sake of argument that the Los Angeles and New York City operations "are completely different in all respects," the allegation that the public will be deceived is simply not correct.

To begin with, we disagree that the Los Angeles and New York City operations are completely different in all respects We have already discussed their differences, but it must be remembered that both operations offer the same basic services, namely, the serving of beer and food

25

More importantly, a customer who is familiar with BREWSKY'S tavern in lower Manhattan would hardly expect, should he plan to visit BREWSKI'S restaurant and microbrewery in Los Angeles, that the two would be identical. In addition, if a patron of BREWSKY'S tavern in lower Manhattan were to travel to Los Angeles and visit BREWSKI'S restaurant and microbrewery (brewpub) in Hermosa Beach, he or she would readily discern that there are clear differences in the two operations.

It has been noted that "some changes in the product [or service] represented by a trademark [or service mark] are expected by the public Other changes are readily discernible. In neither case is the public deceived." Hanak, "The Quality Assurance Function of Trademarks," 43 Fordham Law Review 363, 365 (1974), reprinted in 65 The Trademark Reporter 318, 320 (1975) and in Corporate Counsel's Annual 1975 (Matthew Bender) and cases cited therein. Moreover, in this case there is an additional factor preventing any possible public deception, namely, the fact that the full names of the New York City establishment (BREWSKI'S tavern) and the Los Angeles establishment (BREWSKI'S restaurant and microbrewery) are different. The American public has been exposed to hundreds of products and services that come in "variations" bearing the same mark, but with different generic terminology. Even if the public

26

would not distinguish between BREWSK_Y_'S and BREWSK_I_'S, it would be on notice that BREWSKY'S tavern and BREWSKI'S restaurant and microbrewery almost certainly offer different types of bar and restaurant services.

Decision:  The petition for cancellation is denied. Respondent's counterclaim is also denied.

E. J. Seeherman

E. W. Hanak

T. J. Quinn
Administrative Trademark
Judges, Trademark Trial
and Appeal Board

MAY - 6 1998