THIS DISPOSITION IS
CITABLE AS
PRECEDENT OF THE TTAB

Hearing:                                         Mailed:
January 12, 2006                                 August 23, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Tea Board of India
v.
The Republic of Tea, Inc.

_____

Opposition No. 91118587

_____

Michael Chiapetta of Fross Zelnick Lehrman & Zissu, for Tea Board of India.

Matthew A. Rosenberg of Blumenfeld, Kaplan & Sandweiss, P.C. for The Republic of Tea, Inc.

_____

Before Holtzman, Rogers and Zervas, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

An application has been filed by The Republic of Tea, Inc. (applicant) to register the mark DARJEELING NOUVEAU on the Principal Register for "tea" in International Class 30.[1] The word DARJEELING is disclaimed.

---

[1] Application Serial No. 75748952, filed on July 13, 1999, alleging dates of first use and first use in commerce on March 1, 1999.

Opposition No. 91118587

On May 1, 2000, the Tea Board of India (opposer or Tea Board) filed an opposition to registration of the mark in the above application.  In the notice of opposition, as amended, opposer alleges that it is a non-trading, non-profit body established by the Government of India under the India Tea Act of 1953 for the purposes of controlling the Indian tea industry; that opposer is the owner of Registration No. 1632726 for the certification mark shown below for tea in Class A;[2] that opposer



owns pending application Serial No. 76357485 for the certification mark DARJEELING (in standard character form) for tea in Class A; that opposer also has common law rights in the certification marks by virtue of its licensees' use of these certification marks and opposer's control over such use of the certification marks as indications of regional origin for tea; that as part of its activities, opposer has controlled use of the marks DARJEELING and DARJEELING and design by others to certify

---

[2] Issued January 22, 1991 with a claim of first use on August 31, 1987 and first use in commerce on September 10, 1987.  The registration states, "The certification mark, as used by persons authorized by certifier, certifies that a blend of tea contains at least sixty percent (60%) tea originating in the Darjeeling region of India, and that the blend meets other specifications established by the certifier."

that tea originates in the Darjeeling region of India and that the tea meets other specifications established by opposer; that since at least as early as August 31, 1987, prior to applicant's use, opposer has authorized use of the DARJEELING and design mark in interstate commerce in connection with tea originating from the Darjeeling region of India; that opposer's marks have become famous, and that they became famous prior to applicant's use of its claimed mark; that applicant's mark DARJEELING NOUVEAU when applied to applicant's goods so resembles opposer's previously used and registered DARJEELING and design mark and DARJEELING word mark as to be likely to cause confusion or mistake or to deceive; and that the use and registration by applicant of DARJEELING NOUVEAU for applicant's goods is likely to dilute the distinctive quality of opposer's famous marks.[3]

Applicant filed an answer denying the salient allegations in the amended opposition and asserting certain affirmative defenses. When opposer's pleaded application Serial No. 76357485 for DARJEELING issued into Registration No. 2685923 on February 11, 2003, applicant moved to amend its answer to add a

---

[3] Opposer also alleges a violation of the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs), Article 22.1, causing further damage to opposer and those persons authorized to use opposer's marks. We do not treat this allegation as a separate claim because TRIPs is not a self-executing treaty. See, e.g., In re Rath, 402 F.3d 1207, 74 USPQ2d 1174, 1179 n. 2 (Fed. Cir. 2005) (noting that, under 19 U.S.C. §3512(c), Congress has specifically precluded any person other than the United States from using TRIPs as a cause of action or defense.)

counterclaim to cancel the registration. Opposer then moved to further amend the opposition to plead ownership of the registration. The Board, on May 12, 2004, granted applicant's motion to add the counterclaim and, finding that the parties had stipulated to the admissibility of the registration, held opposer's motion to amend the pleading moot. We hereby deem the pleading amended under Fed. R. Civ. P. 15(b) to conform to the evidence by asserting Registration No. 2685923.[4]

By its counterclaim, applicant seeks to cancel opposer's Registration No. 2685923 for the word mark DARJEELING under Section 14(5)(A) of the Trademark Act on the ground that opposer "does not control, or is not able legitimately to exercise control over, the use of the mark."[5]

---

[4] The registration sets forth a date of first use on August 31, 1987 and first use in commerce on September 10, 1987. The registration states, "The certification mark, as used by authorized persons, certifies that the tea contains at least 100% tea originating in the Darjeeling region [of] India, and that the blend meets other specifications established by the certifier."

[5] Applicant has not counterclaimed to cancel opposer's other pleaded registration for DARJEELING and design even though it too contains the word DARJEELING. Nevertheless, we do not consider the counterclaim against DARJEELING to constitute a collateral attack on the registration which consists only in part of DARJEELING. See Sweats Fashions Inc. v. Pannill Knitting Co. Inc., 833 F.2d 1560, 4 USPQ2d 1793, 1796 (Fed. Cir. 1987) ("The registration affords *prima facie* rights in the marks *as a whole*, not in any component. Thus, a showing of descriptiveness or genericness of *part* of a mark does not constitute an attack on the registration.") (Emphasis in original.)

4

Opposer filed an answer denying the allegations in the counterclaim.[6]

The record includes the pleadings; the files of the involved application and registration; opposer's testimony, with exhibits, of Kumar Sanjay Krishna, deputy of the Tea Board of India; and Anindita Ray, deputy director, tea promotion, of the Tea Board of India; the stipulated testimony under Trademark Rule 2.123(2)(b) of "the Tea Board of India";[7] applicant's testimony, with exhibits, of Carl E. Block, Ph.D., president of Doane Marketing Research, the company which conducted the survey of record in this case; and Denise A. Barberis, paralegal for the intellectual property department of Blumenfeld, Kaplan & Sandweiss, P.C.  The record also includes notices of reliance filed by opposer on May 16, 2002 and October 3, 2003, and by

---

[6] Opposer also set forth certain affirmative defenses in its answer which were neither tried nor argued and are therefore deemed waived. Further, to the extent, if any, that opposer's estoppel defense was based on the "Morehouse" defense, such defense would not apply in this case because the marks in the two registrations are not the same.  We also note that applicant is a licensee of the DARJEELING and design mark and to the extent opposer is asserting licensee estoppel, such defense does not apply to certification marks.  See Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories, Inc., 12 USPQ2d 1267, 1275 n. 6 (TTAB 1989) [hereinafter "Midwest (TTAB)"] ("There can be no licensee estoppel involving a certification mark."), aff'd, 906 F.2d 1568 (Fed. Cir. 1990).  See also Idaho Potato Commission v. M&M Produce Farm & Sales, 335 F.3d 130, 67 USPQ2d 1348 (2d Cir.2003), cert. denied, 541 U.S. 1027 (2004).

[7] References in this decision to "opposer's testimony" or citations to "Stip. Test." are references or citations, respectively, to the stipulated testimony of the Tea Board.

applicant on July 11, 2003; and "stipulated exhibits" filed by the parties on October 3, 2003.[8]

Both opposer and applicant filed briefs.[9] An oral hearing was held.

*Facts*

India is the largest producer of tea in the world. (Ray Test., p. 3.) Ms. Ray states that the tea industry in India has been controlled by the Indian government since 1933 through a series of statutes culminating with the Tea Act of 1953. Opposer, the Tea Board, is a governmental body established by the Tea Act in 1953 to develop and implement a certification program to regulate and control all aspects of the production and sale of teas from different Indian regions, including tea from the Darjeeling region of India. The composition of the Tea Board is diverse, comprised of members representing owners of tea estates, the state governments, members of Parliament, workers' representatives, exporters, packers and consumers.

---

[8] The parties have stipulated to the admissiblity and authenticity of the "stipulated exhibits" and the exhibits submitted by notice of reliance but not the truth of the matters asserted in such exhibits, nor the competency, relevance or materiality of such evidence. Indeed, printed publications made of record by notice of reliance are admissible and probative only for what they show on their face, not for the truth of the matters contained therein, unless a competent witness has testified to the truth of such matters. See TBMP §704.08 (2d ed. rev. 2004.)

[9] There are two sets of briefs in the record; one set is for the opposition and the other is for the counterclaim.

Ms. Ray states that Darjeeling is a district located in the state of West Bengal, India and that tea has been cultivated, grown and produced in the 87 "tea gardens" located in this region for 150 years.  The gardens are located, according to Ms. Ray, "at elevations up to over 2000 metres above mean sea level." (Test., p. 4.)  As described on a page from applicant's website, in the record, this region is "high in the foothills of the Himalayan range at altitudes of up to 6,000 feet."  Ms. Ray states that due to the "unique and complex combination of agro-climatic conditions" in the region and the production regulations imposed, Darjeeling tea "has a distinctive and naturally-occurring quality and flavour." (Ray Test., p. 4.)  Mr. Krishna describes Darjeeling as "the champagne of teas."  (Test., p. 29.)

As described by Ms. Ray, the Tea Board administers and regulates, under an elaborate system of control, all stages of cultivation, processing, promotion and sale of Darjeeling tea, including both domestic sales and exports of the teas to overseas markets. Ms. Ray explains that all of the 87 tea gardens are registered with the Tea Board and that the Tea Board regularly monitors these gardens by making periodic checks and inspections. The Tea Board certifies that all Darjeeling tea which is intended for export originates from the "specified region of the district of Darjeeling, West Bengal, India" (Ray Test., p. 8) and all

7

exporters of Darjeeling tea are required to be registered with the Tea Board and licensed to use the DARJEELING and design mark.

The importers and sellers of Darjeeling tea in the United States may use the DARJEELING and design mark (hereinafter "logo mark") if they obtain permission from the Tea Board to do so. They must demonstrate that they have purchased the tea directly from registered exporters and samples of the tea proposed to be sold under the mark must be submitted to the Tea Board for analysis by a panel of tea tasters appointed by that Board. After the panel is satisfied as to the origin and characteristics of the tea samples, the users must sign an "undertaking" requiring them to use the mark in connection with 100% Darjeeling tea which meets the requirements of origin and characteristics of the tea. Ms. Ray identified 15 authorized users of the logo mark including The Republic of Tea (applicant herein), Tazo, Choice Tea, Stash Tea Co., Thomas J. Lipton, and James Finlay & Co. USA Inc.

Ms. Ray states that India has been exporting tea from the Darjeeling region of India and selling the tea in the United States for the past 50 years. She does not specify when any formal certification program by the Tea Board first began except to say that the program "has been in existence for a long time." (Test., p. 7.) Ms. Ray also states that the Tea Board has taken periodic steps during that time to refine and improve its

8

regulations in response to consumer input and feedback and that the Tea Board developed the logo mark "in [the] mid 1980s" to give "a more structured shape to its certification program to deal with the challenges of the trade worldwide." (Test., p. 6.) Mr. Krishna states that implementation of the logo program was prompted by "certain complaints that the teas were not Darjeeling teas, that they were blending with other teas." (Test., p. 32.)

Acknowledging that the certification statement in the registration for the logo mark as well as the regulations governing use of the mark initially indicated that a minimum of 60% Darjeeling tea was permissible, Ms. Ray claims that the registration "has now been amended" to require 100% Darjeeling tea,[10] (Test., p. 11) and that the regulations have been modified to require 100% Darjeeling tea as well. (Stip. Test., p. 6.)

According to Ms. Ray and opposer's stipulated testimony, the Tea Board is prepared to take legal action against third parties that misuse the logo mark or the word mark but that opposer is not aware of any actual misuse of the marks and has not had occasion to take such action in the United States. (Ray Test., p. 12; Stip. Test., p. 3.)

---

[10] There is no evidence of record that the registration has been so amended and the Office records show that no such amendment has been entered.

Opposer testified that the Tea Board regularly attends bi-annual trade shows to promote Darjeeling tea where it distributes literature about the origin, growing, harvesting and production of the tea. Opposer also sends representatives to supermarkets throughout the United States to distribute literature and educate consumers about the various Darjeeling and other Indian teas and the geographic areas in which they are grown.

Applicant did not take any testimony regarding the use of its mark, but applicant's responses to discovery requests made of record by opposer indicate that applicant began selling tea, from the Darjeeling region of India, under the mark DARJEELING NOUVEAU on or about March 1, 1999 and that applicant describes this tea as "first flush" tea from the region. Applicant sells its tea through gourmet and specialty food stores, natural food groceries and department stores, gift stores, cafes and in restaurants, as well as through mail order catalogs and direct sales through the Internet. Applicant identified stores in seven states in which its tea is sold.

Applicant is a licensee of the Tea Board and a "certified user" of opposer's logo mark and uses it to represent that the tea consists of 100% Darjeeling tea. Applicant states in its brief that it uses the logo because it wants the public to know that its teas are of the highest quality and to allow the public to differentiate its tea from what it claims are "the numerous

10

other 'DARJEELING' teas in the market that are not truly from the Darjeeling regions." (Brief in Opp. 10.) Applicant, like opposer, makes efforts to educate the public concerning Darjeeling tea, and applicant states in its brief that it "will undoubtedly continue to work independently and with the Tea Board regardless of the outcome of this case, to help people understand that tea from the Darjeeling region of India truly is," quoting Mr. Krishna, "'the Champagne of teas.'" (Brief in Opp., p. 9.)

### COUNTERCLAIM TO CANCEL REGISTRATION NO. 2685923
### for DARJEELING

We turn first to applicant's counterclaim to cancel Registration No. 2685923 under Section 14(5)(A) of the Trademark Act.[11] That section of the statute permits cancellation of a certification mark registration at any time when the registrant "does not control, or is not able legitimately to exercise control over, the use of such mark."

The purpose of requiring control over use of a certification mark, as with a trademark, is two-fold: to protect the value of the mark and its significance as an indication of source, and to prevent the public from being misled or deceived as to the source

---

[11] As noted earlier, applicant has not filed a counterclaim challenging the validity of Registration No. 1632726 for the logo mark. Consequently, any arguments by or evidence from applicant that opposer fails to exercise control over the logo mark constitute a collateral attack on the validity of the unchallenged logo registration and have not been considered in our evaluation of the counterclaim against the DARJEELING word mark.

11

of the product or its genuineness. See Midwest Plastic Fabricators, Inc. v. Underwriters Labs., Inc., 906 F.2d 1568, 15 USPQ2d 1359, 1362 (Fed. Cir. 1990) ("...to protect the public from being misled"); and, generally, *McCarthy on Trademarks and Unfair Competition* §2:33 (4th ed. 2006).

It is applicant's position that opposer does not control, or cannot legitimately exercise control over, the use of the word mark DARJEELING because, according to applicant, the mark has lost its significance as an indication of geographic source and among the general consuming public has become a generic term denoting a certain type of tea. (Counterclaim brief, p. 7.) Applicant proceeds to argue variously that because DARJEELING identifies a type of tea, or identifies geographic sources other than Darjeeling as the origin of the tea, or identifies tea that is not genuine because it is not used in connection with tea that is 100% from Darjeeling, the mark has lost its significance as a mark.[12]

---

[12] At one point in its brief applicant appears to argue that DARJEELING has lost its significance as an indicator of origin, or, in the alternative, that opposer has failed to maintain control over the mark. To the extent that applicant is asserting a claim under the "does not control" language of the statute, and is arguing that any evidence whatsoever of lack of control over third party use results in a per se violation of the statute, without regard to the nature, extent or effect of any such "lack of control," applicant has provided no authority for such proposition, and we have given this argument no further consideration. Thus, we make no separate findings under this portion of the statute, and have construed all of applicant's arguments as a claim that DARJEELING has lost its significance as a mark and has become generic.

In support of its position, applicant points to opposer's asserted failure to police the mark resulting in unlicensed and unregulated third-party usage, years of uncontrolled use prior to implementation of the formal certification program in 1987, and deficiencies in the regulations themselves. In addition, applicant relies on the results of a survey, dictionary definitions of Darjeeling, third-party usage of Darjeeling, and lack of widespread use of the logo mark by third parties.

To begin with, we note that DARJEELING is used to certify regional origin of the tea and, as is often the case with geographical indications, the mark also certifies certain qualities and characteristics of the product that are due to factors associated with the geographic region.[13] See, e.g., Bureau National Interprofessionnel Du Cognac v. International Better Drinks Corp., 6 USPQ2d 1610 (TTAB 1988) (COGNAC certifies regional origin as well as the quality of the brandy which quality results from the use of the required type of grape, methods of distillation, aging conditions, etc.); and Community of Roquefort et al. v. William Faehndrich, Inc., 198 F.Supp. 291, 131 USPQ 435 (S.D.N.Y. 1961), aff'd, 303 F.2d 494, 133 USPQ 633

---

[13] We construe the reference to "other specifications" in the registration as meaning that users of the certification mark meet the requirements relating to the qualities and characteristics of the tea, as set forth in opposer's regulations.

13

(2d Cir. 1962) (ROQUEFORT indicates geographic source and methods for production and manufacture associated with that region).

A certification mark used to certify regional origin as well as qualities and characteristics associated with the origin will not be deemed to have become a generic term as applied to particular goods unless it has lost its significance as an indication of regional origin for those goods. See Institut National Des Appellations d'Origine v. Brown-Forman Corp., 47 USPQ2d 1875 (TTAB 1998). This can occur when, by virtue of a failure to control the mark, the mark is used on goods which originate somewhere other than the place named in the mark, or on nongenuine goods, or through otherwise uncontrolled use, but only if as a result of such misuse, the mark has come to primarily signify a type of goods with certain characteristics, without regard to regional origin and the methods and conditions for growing it. See Community of Roquefort v. Faehndrich, Inc., supra; and In re Cooperativa Produttori Latte E Fontina Valle D'Aosta, 230 USPQ 131 (TTAB 1986). See also BellSouth Corp. v. DataNational Corp., 60 F.3d 1565, 35 USPQ2d 1554, 1557 (Fed. Cir. 1995) ("A term may become generic over time through common usage if the otherwise nondescriptive term is not policed as a trademark and it is commonly used to describe a type of product." Emphasis added.); and Formica Corporation v. The Newnan  Corporation, 149 USPQ 585, 587 (TTAB 1966) ("It is well

14

settled that a party asserting that an otherwise arbitrary trademark for an article has become a common descriptive name for the article has the burden of showing not only that the mark has been misused in the manner stated but that the misuse thereof has been so widespread and of such duration that there can be no doubt that to the trade and/or to the public generally the mark identifies the article as to kind rather than as to source"), aff'd, 396 F.2d 486, 158 USPQ 104 (CCPA 1968). "A generic term, by definition, identifies a type of product, not the source of the product." In re Steelbuilding.com, 415 F.3d 1293, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005) citing In re Gould Paper Corp., 834 F.2d 1017, 5 USPQ2d 1110 (Fed. Cir. 1987).

The test for determining whether a mark is generic is its primary significance to the relevant public. Magic Wand, Inc. v. RDB, Inc., 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991). The relevant public in this case includes tea "aficionados" and ordinary members of the general public. Evidence of the relevant public's understanding of a term may be obtained from "any competent source...including purchaser testimony, consumer surveys, dictionary definitions, trade journals, newspapers and other publications." In re Dial-A-Mattress Operating Corp., 240 F.3d 1341, 57 USPQ2d 1807, 1810 (Fed. Cir. 2001).

It is applicant's burden to demonstrate by a preponderance of the evidence that DARJEELING is generic, or that the mark has

15

become generic as a result of opposer's failure to exercise control over use of the mark. Magic Wand Inc. v. RDB Inc., supra; and Stocker v. General Conference Corp. of Seventh-day Adventists, 39 USPQ2d 1385 (TTAB 1996). See also *Midwest*, supra at 1362 ("Midwest has the burden to demonstrate by a preponderance of the evidence that UL failed to exercise control over use of its marks.").

### *Lack of control prior to implementation of the "logo" program in 1987, past misuse, and lack of policing*

Applicant argues that although tea from the Darjeeling region has been sold in the United States for around 50 years, the fact that the "logo" program only began in 1987 is evidence that for many years prior thereto, opposer permitted use of DARJEELING in a generic, uncontrolled and unregulated fashion. As further evidence of lack of control, applicant points to the admitted reason for the development of a logo program in the first place which was complaints that manufacturers were selling tea as Darjeeling that in the opinion of the Tea Board was not Darjeeling tea or was Darjeeling tea blended with other teas. Applicant claims that although opposer has admitted there was misuse, opposer has never taken action to remedy any such misuse. Applicant also points out that the Tea Board by its own admission has never taken any enforcement action against any third party for misuse.

16

First, the mere fact that there may have been no formal certification mark program or licensing program in place prior to the adoption of the logo program in 1987 is not in itself evidence that Darjeeling has lost significance as a mark. Halo Management, LLC v. Interland, Inc., ___ F.Supp.2d____, 76 USPQ2d 1199 (N.D.Cal. 2004) (noting that the lack of a formal quality control provision does not automatically divest a trademark holder of protection). The question is whether in fact control is maintained. See Woodstock's Enterprises Inc. (California) v. Woodstock's Enterprises Inc. (Oregon), 42 USPQ2d 1440, 1448 (TTAB 1997) ("while there was never a formal system of quality control, the inference of abandonment is not drawn...[where] satisfactory quality was maintained"), aff'd (unpublished), 152 F.3d 942 (Fed. Cir. 1998).

The statute does not define "control" or indicate the degree of control required, but it is clear that absolute control would be impracticable, if not impossible. See *Midwest*, supra. See also, e.g., Engineered Mechanical Services, Inc. v. Applied Mechanical Technology, Inc., 584 F.Supp. 1149, 223 USPQ 324 (M.D.La. 1984) ("The owner of a mark is not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of his shotgun instantly upon spotting a possible infringer..."). The question is whether the control is adequate. As stated in *Midwest*, supra at 1363, "the owner must

17

take reasonable steps, under all the circumstances of the case, to prevent the public from being misled."

Applicant has introduced no evidence that the Tea Board did not in fact adequately control the use of the mark during the time prior to the implementation of the formal certification mark program in 1987. There were admittedly concerns about misuse which prompted the Tea Board to implement a formal certification mark program and stricter standards of control.[14] However, the mere fact of misuse, just like the mere absence of formal control, is not sufficient to raise an inference that the control was not adequate or that DARJEELING has lost all significance as a mark. Even if control is not maintained and misuse occurs, it must be shown that the misuse was of such significance to permit an inference that the mark is generic. See *Formica*, supra; and *Engineered*, supra (defendants did not prove that because of the lack of efforts by plaintiffs in "policing" use of the mark, that the mark has become so diluted by widespread use by others that

---

[14] Applicant in passing also points to a long cancelled third-party registration for DARJEELING GARDENS (Registration No. 1490383, cancelled under Sec. 8 in 1994) apparently as further evidence of opposer's loss of control over the mark. This cancelled registration is of no evidentiary value and, in any event, just as a third-party registration is not probative of use it cannot be probative of misuse.
  In addition, applicant refers to an article entitled "U.S. Tea is 'Hot' Report" which according to applicant "intimates" that more tea is sold as Darjeeling annually in the United States than is actually harvested in Darjeeling. This evidence is unpersuasive for several reasons. Ms. Ray testified that she was not aware of any data to authenticate that claim; the article is hearsay; and applicant is required to establish facts to prove its claim, not "intimate" them.

it has lost its distinctiveness); and, e.g., University Book Store v. University of Wisconsin Board of Regents, 33 USPQ2d 1385 (TTAB 1994) (few occasional and transitory incidents regarding quality insufficient); *Midwest* (TTAB), supra (occasional, sporadic problem insufficient); and *McCarthy*, supra at §18:58 ("Isolated instances of continued use of a mark by terminated licensees is not itself evidence that the licensor does not have an adequate program of control over the mark [citations omitted]").  Compare *Bellsouth*, supra at 1558 ("near universal" use of logo by competitors was strong, albeit circumstantial, evidence of genericness); and Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 765, 214 USPQ 327 (Fed. Cir. 1982) ("numerous" products in the marketplace bearing the alleged mark, and the conduct of the owner, by failing to police its mark, can be said to have caused the mark to lose its significance as a mark).

We have no information about the nature or extent of the past misuse of DARJEELING, let alone whether the misuse was of such extent and duration that we could presume that DARJEELING has lost all significance as a mark.

Indeed, opposer has shown that control was in fact maintained, and that the misuse was not tolerated and did not go unaddressed.  Upon learning of the misuse, opposer took affirmative steps to remedy the problem by implementing the logo

19

program in 1987.  While, as applicant claims, opposer never took any enforcement action against any third party for the misuse that occurred, there is no evidence that such action was necessary or that the action opposer did take was not sufficient to remedy the past misuse.  See *Midwest* (TTAB), supra at 1275 (noting petitioner's argument that other steps should have been taken by respondent, the Board stated "it is not the Board's province to delineate guidelines or rules for respondent or to indicate what actions respondent should or should not take in exercising control over the use of its marks.  Rather, the Board's only task is simply to review the factual record before it and determine whether the facts presented warrant a conclusion that respondent has failed to exercise control over its marks.")

The fact that the Tea Board, in response to changing needs and circumstances, has instituted increasingly tighter controls over use of the mark is clearly not evidence of lack of control and certainly not evidence that the mark has lost significance. To the contrary, it is evidence of opposer's continuing efforts to maintain control of the mark and protect its value as a geographical indication.  See, e.g., Zimmerman v. National Association of Realtors, 70 USPQ2d 1425 (TTAB 2004); and *University Book Store*, supra.

In addition, opposer's current standards provide adequate provisions for control over the mark and applicant does not

dispute this.[15]  As further evidence of opposer's efforts to control the mark, the Tea Board testified that if it were to receive any complaints of adulterated tea it would check the quality of the tea and take action if the tea was found not to be genuine.  Although there was misuse in the past, opposer stated that the Tea Board currently "is not aware of any actual misuse of the DARJEELING designation in the U.S."  (Stip. Test., p. 3.) Opposer also testified that the Tea Board has representatives in the United States to monitor the market to ensure that the DARJEELING designation is not misused.  In any event, as we noted earlier, we would not infer from lack of policing alone that opposer's control was not adequate or that DARJEELING has lost its significance as a mark.  See *Engineered*, supra.

### *The Prior Regulations*

Applicant argues that as shown by the registration certificate for the logo mark, and as opposer admitted, when the logo program was first started in 1987, the Tea Board permitted use of the logo mark with as little as 60% of the tea coming from

---

[15] The regulations detail the requirements of origin and characteristics of the tea and for permitting use of the marks.  They also provide for, among other things, inspection of the user's premises in order to test the tea for origin and the "distinctive characteristics" associated with the tea, as well as supervision over use of the marks.  Opposer also points to its efforts to educate the public about Darjeeling tea. Opposer testified that the Tea Board regularly attends the bi-annual trade shows where it distributes literature about the origin, growing, harvesting and production of Darjeeling tea.  In addition, Mr. Krishna testified that opposer sends representatives to supermarkets throughout the United States to distribute such literature, although few details of this activity have been provided.

Darjeeling and that up to 40% of the content of certified Darjeeling tea could originate from some other place. Applicant further points to opposer's subsequent "draft" regulations which allowed the DARJEELING word mark to be used in connection with as little as 5% tea from Darjeeling. Applicant argues that the Tea Board circulated this set of regulations unaccompanied by any solicitation for comments and without indicating that it was in proposed form. Applicant concludes that this set of regulations "was never intended as a draft when it was first released" and further, that regardless of whether it was in proposed or final form, "it speaks nonetheless to the Tea Board's knowledge of the reality that not all tea sold as "DARJEELING" really originates from Darjeeling." (Counterclaim Brief, p. 4.)

There are, of record, four sets of regulations issued by opposer since 1987. The first set of regulations covers just the logo mark. These regulations appear to permit use of the mark only in connection with 100% Darjeeling tea.[16] It is not clear when these regulations became effective. We do not have of record what are apparently the original 1987 regulations

---

[16] These regulations provide, in part, that the mark may be used in relation to a blend of Darjeeling teas drawn from more than one tea garden "only if each tea constituting the blend" complies with the regulations. The regulations also specifically state that "The Certification Mark may not be used in relation to a mixture of Darjeeling tea with teas of other origin and/or countries, even in phrases incorporating the word 'blend' such as 'DARJEELING Blend' or 'Blended DARJEELING.'" It is not clear when these regulations became effective.

governing the logo mark that applicant has challenged.  However, there appears to be no dispute that those regulations permitted use of the logo mark in connection with tea consisting of blends including up to 40% tea from some place other than Darjeeling.

The second set of regulations covers only the DARJEELING word mark.  These regulations were submitted in connection with the application for the word mark on January 10, 2002.  They provide, in part, that the mark "may be used in relation to a blend of Darjeeling teas drawn from more than one tea garden..." but that the mark "may not be used in relation to a mixture of Darjeeling tea with teas of other origin and/or countries, even in phrases incorporating the word 'blend' such as 'DARJEELING Blend' or 'Blended DARJEELING'"

The third set of regulations governs use of both the word mark and the logo mark.  These are the disputed "draft" regulations.  At some point in January or early February 2004, the Tea Board, through Mr. Krishna, sent new regulations to the United States Tea Association for circulation to its members without mentioning that the regulations were in draft form and that they were to be circulated only for review and comment. These regulations did not permit use of the logo mark with any tea that is less than 100% tea from Darjeeling, but did allow use of the DARJEELING word mark with a blend of tea that consisted of 5% tea from Darjeeling and 95% from other regions.  According to

23

the stipulated testimony of the Tea Board, those percentages were a "drafting error." (Stip. Test., p. 4.) Further, according to this testimony, when Mr. Krishna realized his mistake, on February 4, 2004, he sent an email to the United States Tea Association which was forwarded to all recipients of the draft explaining that the regulations were in draft form and inviting member comments.

The fourth set of regulations covers both the logo mark and the word mark. These are final regulations that were issued by the Tea Board on December 23, 2004 and they are the most current regulations in the record. The regulations permit use of both marks only in connection with 100% Darjeeling tea, define the term "blend" to mean only a blend of tea from more than one Darjeeling tea garden, and delineate the requirements for use of "the word Darjeeling" in connection with a component of a tea mixture.

Applicant appears to conclude from the fact that the original 1987 regulations covering the logo mark and the portion of the more recent "draft" regulations that covered the word mark permitted use of the respective marks in connection with less than 100% Darjeeling tea, that the regulations allowed for inherently deceptive use of the DARJEELING word mark and logo mark, and resulted in misleading use of the marks per se.

24

Applicant has offered no support in law or reason for this contention. There is nothing inherently deceptive in permitting use of the mark to identify a component of the tea, if it is the component that is being certified. A certification mark does not exist in a vacuum. It cannot be considered apart from that aspect of a product that is being certified and the standards for certification. See Opticians Association of America v. Independent Opticians of America Inc., 734 F. Supp. 1171, 14 USPQ2d 2021, 2027 (D.N.J. 1990) ("certification mark serves as seal of approval for, or guarantee of compliance with, uniform standard"); and American Speech-Language-Hearing Assn. v. National Hearing Aid Society, 224 USPQ 798 (TTAB 1984). Thus, even if opposer was authorizing use of the marks to identify a component of an entire tea product, as long as the standards provided for adequate control of the marks when used in that manner, then as a matter of law, the standards were not deceptive. Further, if the marks were used in accordance with those standards, then the marks were not being used in a deceptive or misleading manner, and consumers could not have been deceived as to the source of the product or its purity.

Accordingly, we would need to look to opposer's regulations and the provisions for control over use of the marks. However, we do not have copies of the original 1987 regulations which apparently allowed use of the logo mark on blends consisting of

25

40% non-Darjeeling tea or information as to the provisions for control in those regulations. Therefore, we can make no determination as to whether the control under those regulations was adequate.[17] As to the "draft" regulations, we find that opposer has shown by testimony and supporting documentation that they were effectively only a proposal, even though they were not identified as such, and that they were never effectively employed by opposer or relied on. Therefore, we will not make any determination as to their adequacy.

However, even assuming we found the standards in the "draft" regulations to be inadequate, while it has been held that license agreements without adequate provisions for quality control ("naked licenses") may result in a forfeiture of the mark (see, e.g., Stanfield v. Osborne Industries Inc., 52 F.3d 867, 34 USPQ2d 1456 (10th Cir. 1995)), we would not presume that a certification mark had lost its significance merely because of a "naked license," in the absence of an actual showing of loss of trademark significance. See Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 42 USPQ2d 1417 (5th Cir.), cert. denied, 118 S. Ct. 299 (1997).

---

[17] Nor would we make any such determination because applicant's argument constitutes a collateral attack on the validity of the logo mark registration. Applicant is, in effect, contending that the manner in which the Tea Board was using the registered logo mark had the effect of misleading the public.

26

*Third-Party Usage of DARJEELING word mark and lack of "widespread" usage of DARJEELING logo mark*

Applicant alleges that there is in fact current misuse of the DARJEELING word mark.  Ms. Barberis testified that she went to five grocery stores in the St. Louis area and purchased nine packages of tea, a package of every brand of tea she could find that was designated "Darjeeling."  Applicant made of record photocopies of at least some portion of each of the nine packages.  Each package prominently displays the brand name of the tea as well as the term DARJEELING, which usually appears spatially separated from the brand name, and contains other informational text as follows:

> TWINNINGS OF LONDON...DARJEELING TEA: One of the world's finest blends of teas, with a distinctive delicate flavour; A tea from the Darjeeling region of India, in the foothills of the Himalayas.  Darjeeling is valued for its fine, delicate flavour and aroma and is considered the "champagne" of teas.

> TAZO The Reincarnation of Tea DARJEELING Organic Varietal Black Tea:  Capturing the essence of the Himalayas; ...The climate in the Himalayan foothills of Darjeeling is so perfect for the organic growing of tea. ... Organic Tazo Darjeeling is grown organically near India's border with Bhutan.  Containing only true Darjeeling leaves, its luminous taste is a blend of the lightly floral, first flush Darjeeling and the full, rich second flush Darjeeling. ...

> CELESTIAL SEASONINGS...GOLDEN HONEY DARJEELING:  The Champagne of Teas; At the foothills of the mighty Himalayan Mountains sits Darjeeling, a name of Tibetan origin meaning "land of thunderbolts."  A unique combination of growing conditions and the hard work,

and devotion of the Darjeeling people produces what experts call "the champagne of teas."

DARJEELING...STEWARTS:  The World's finest tea grown on the slopes of the Himalayas.  Rich, Exquisite Bouquet DARJEELING.

CREDO TEA DARJEELING:  Ingredients:  Handpicked pure Darjeeling tea; Product of India.

THE CHAMPAGNE OF TEAS 50 DARJEELING TEA BAGS; WILLIAMSON & MAGOR: Produce of India; Our pure Darjeeling tea.

BIGELOW...DARJEELING BLEND:  Rich, pure and fragrant ... this TEA is known as the champagne of teas; DARJEELING BLEND:  Darjeeling is the richest and finest of the world's great teas.  Slow grown on the slopes of the Himalayas, this rare and costly tea is renowned for its exceptional character and exquisite bouquet... .

DEAN & DELUCA...DARJEELING RISHEESHAT: India Black Tea.

CHOICE Organic Teas...ORGANIC...DARJEELING TEA:  Choice Organic Darjeeling Tea is a premier varietal from the Makaibari Garden in the Himalayan foothills; ... unblended ...; Ingredients:  Pure Organic Darjeeling Tea.

Applicant argues that this evidence shows that Darjeeling has lost its significance as an indication of origin because several packages indicate that the tea is a "blend" which, according to applicant, means that the contents are not entirely from the Darjeeling region; that the tea would not be eligible for certification under the Tea Board's current standards; and that opposer has admittedly never taken any action against any third-party users.  In addition, applicant introduced the receipts for the purchase of each product asserting that the

differences in the prices for certain brands further indicates some teas are not 100% tea from Darjeeling.

We do not see how the use of DARJEELING on any of these packages is probative of generic use. Nor do the packages show deceptive or misleading use of Darjeeling. We have found that the current standards provide for adequate control, and there is nothing on the face of the packaging or otherwise in the record to indicate that the tea contained in these packages is not in compliance with those standards. Each of the nine packages, on its face, indicates in more or less specific terms that the tea is from the Darjeeling region of India. There is nothing to indicate that the tea is anything other than 100% tea from Darjeeling. Nor is there any indication that any tea identified as "blended" includes anything besides teas from more than one Darjeeling tea garden, rather than a blend of tea from different geographic regions.[18] See, e.g., Community of Roquefort v. Santo, 157 USPQ 444, 447 (TTAB 1968) (in the absence of any conclusive evidence to indicate that the listing of "Roquefort cheese" as an ingredient of applicant's product was, as opposer charged, a blatant misrepresentation, the Board held it must assume that

---

[18] Opposer testified that the prior regulations were revised to prevent use of the term "DARJEELING blend" in connection with tea that includes any portion of non-DARJEELING tea and to clarify the meaning of "blend," pointing out that teas from a single Darjeeling garden are more highly valued and more expensive than teas from more than one garden. (Stip. Test., p. 4.)

applicant's product contained an unspecified quantity of "ROQUEFORT" cheese.)

The packages of CELESTIAL SEASONINGS, TWINNINGS OF LONDON and BIGELOW all contain references to a "blend." Although it cannot be seen on the portions of the CELESTIAL SEASONINGS package reproduced in applicant's exhibits, Ms. Barberis read the following information from the package into the record, "Our Golden Honey Darjeeling is a lively black tea blend with lightly fragrant overtones"; and she stated that the package lists the ingredients as "black tea, orange peel, chamomile flowers, natural honey flavor with other natural flavors and dried honey." While the product may contain orange peel and other ingredients, the mark is used to certify that the <u>tea</u> contained in the product is genuine and there is nothing to indicate that the tea itself is not entirely from Darjeeling.

In addition to the reference to "blend" on the TWINNINGS OF LONDON package in the text reproduced above, Ms. Barberis read the following wording from the package: "Darjeeling tea blended by Twinnings of London, England" and "Black tea *such as the tea contained in this package* and green tea naturally contain flavonoid antioxidants...." (Emphasis added.) We see nothing misleading about the reference to "blends" or "blended" on this package. Darjeeling tea is a "black tea" and there is nothing to

30

show that the "blend" is anything other than a permissible blend of black teas from more than one Darjeeling tea garden.

Similarly, there is no indication that "BIGELOW Darjeeling Blend" is anything other than pure Darjeeling tea from more than one Darjeeling garden. Nor is there any evidence that the reference to black Darjeeling "Teas" (plural), on the TAZO package refers to anything other than "teas" from more than one Darjeeling garden.

Applicant's argument concerning the price differences between certain brands of tea is also unpersuasive. The receipts show that the DEAN & DELUCA brand cost $12.50, that the WILLIAMSON & MAGOR brand cost $12.99, and that the prices for all the other brands are in the range of $3.00. Many variables could explain the differences in price. First, as opposer testified, if the tea is a blend of tea from more than one garden it would affect the price of the tea. This could explain the higher prices of teas not marked as "blended." The difference could also be attributed to the weight of the product. We note that most or all of the lower priced brands weigh 1.1-2.0 ounces while the more expensive DEAN & DELUCA brand, for example, weighs 4 ounces.[19] Another reason for the price difference could be the packaging itself. For example, the more expensive WILLIAM &

---

[19] The weight of the WILLIAMSON & MAGOR tea product is not shown on the photocopied portions of the package that we have of record.

MAGOR brand consists of an elaborate tin in the shape of an elephant which could explain the higher cost for the item.

As further evidence that DARJEELING has lost all significance as a mark, applicant points to the following: the fact that none of the nine packages bears the logo mark; that apart from applicant and the one other company in the United States (The Stash Tea Company) using the Darjeeling logo mark, there are no other sellers of packaged tea sold as Darjeeling in the United States who use that logo; that although Ms. Ray testified that at least 15 companies in the United States are authorized to use the logo mark, opposer did not produce any executed license agreements with these sellers; and that although the Thomas J. Lipton company was identified by Ms. Ray as a licensee, Ms. Barberis, who purchased a sample of every package of tea she could find in five grocery stores in St. Louis, could not find any Lipton "Darjeeling" tea, or any evidence that it sells such tea, let alone any Lipton tea with the logo mark. Applicant submits that lack of "widespread" use of the logo mark is relevant because if most sellers of Darjeeling tea were selling a 100% Darjeeling product, more than just a couple would take advantage of the right to use the logo mark; and that this creates "a further inference that...Darjeeling is being used in connection with the sale of tea that is not 100% from Darjeeling." (Counterclaim Reply, p. 5.)

32

We find this inference unsupportable.  It would be purely speculative to conclude from nonuse of the logo mark that the tea contained in the package is not 100% Darjeeling tea.  Nor will we speculate as to the sellers' reasons for not using the logo mark. In addition, opposer has produced uncontraverted evidence that at least 15 companies are authorized to use the logo mark.  We will not infer from applicant's search for products limited to just a few stores in a single city that packages of tea bearing the logo mark would not be found in other stores located in different cities.

Furthermore, as noted earlier, even assuming applicant had produced evidence of misuse, that is, use indicating a different geographic source for the tea or use in connection with nongenuine tea, we will not infer that the mark has become generic unless it is also shown by applicant that the misuse is so widespread and of such duration that it has caused DARJEELING to lose all significance as a mark.

*The Survey*

Applicant points to the survey in support of its contention that the mark is generic and only denotes a type of tea, and then proceeds to argue that the survey "clearly establishes that the public, as a whole, does not understand that Darjeeling tea comes only from the Darjeeling region of India"; and that there is no association in the public's mind between the term Darjeeling as

33

applied to tea and any specific geographic region. (Brief, pp. 6, 8; Counterclaim Brief, p. 7.)

Opposer challenges the validity of the survey given the open-ended nature of the survey questions and the way the respondents' actual answers were characterized and grouped and maintains that the survey is not evidence that DARJEELING is perceived as a generic term.

To the extent applicant is relying on the survey to show that the term Darjeeling is generic among consumers, which is the actual issue in the case, the survey fails to do so and, as far as we can tell, was not even designed to show that the term is generic. In addition, we find the survey is flawed at least in interpretation of what it does purport to show, and is of little probative value.

This was a telephone survey conducted by Dr. Carl E. Block of Doane Marketing Research. The stated purpose of the survey was "to determine what consumers say Darjeeling tea is." The survey involved 301 respondents who answered preliminary questions indicating that they had purchased tea for themselves or others in their household during the past year and that they are "personally familiar" with Darjeeling tea.

Each respondent was asked the open-ended question "What is Darjeeling tea?" where the respondents could give as many responses as they wished. This question was followed up by the

34

probe "Anything else?". There were a total of 485 answers to the questions given by the 301 respondents.

Applicant introduced, through the testimony of Dr. Block, a written report of the survey which includes, not the verbatim responses,[20] but Dr. Block's summary of responses and a separate "tabulation" of responses. The tabulated responses appear to be more detailed than the summary, but still an abbreviated breakdown of answers. The tabulation consists of a listing of grouped responses, and shows the number of people who gave the responses as well as the percentage of total answers each group of responses represents.

In preparing the summary of responses, Dr. Block "coded" the 485 answers,[21] although it is not clear whether he coded the answers from the verbatim responses or from the tabulated responses. He then grouped each answer under one of five general categories of answers and calculated the percentage of total answers for that category. Those categories with percentages are as follows (for example, the figure "32.4%" represents 32.4% of the total answers):

---

[20] Opposer points out that it requested the database of actual responses during the deposition of Dr. Block but did not receive them and applicant does not dispute that the actual responses were not provided.

[21] Dr. Block stated during his deposition that he did not do all of the coding or all of the summary work. (Test., p. 12.) However, the survey was conducted under his authority and the report was prepared under his signature. Therefore, we consider the report as Dr. Block's own work product.

A type of tea (32.4%)
A tea they buy/don't buy (19.8%)
A tea from India (15.3%)
A tea with certain properties (13.2%)
A tea with some familiarity (7.2%)

Under each category, Dr. Block listed the answers or types of answers which in his judgment should fall into that category. For example, under the category "A type of tea," he listed the following answers or types of answers along with the number of individuals who gave those answers:

A type of tea (32.4%)

```
general reference to type.. 83
black tea.................. 34
herbal tea................. 15
green tea.................. 11
flavored tea................7
caffeinated tea.............4
English tea.................3
```

Dr. Block totaled the percentages of all categories except the category "A tea from India" and came to the following conclusions:  that "a sizable majority (nearly 75%) of the 485 answers ... described [Darjeeling] as a type of tea, a tea they recognize, a tea with certain qualities, or a tea that they may or may not buy"; that "over 75 percent of the 301 respondents did not make any mention of a 'tea from India'..."; and finally that "the vast majority of persons...do not think of Darjeeling tea as a 'tea from India.'"  Dr. Block also states in his report that

36

"74 (24.6%) of the 301 respondents made a reference to a 'tea from India', often along with some other answer..."

First, Dr. Block did not conclude or even suggest that the results show that Darjeeling is perceived as a generic term. Nor do the results support that finding.

Second, we have numerous problems with the way in which Dr. Block interpreted or "coded" the responses as well as the manner in which he grouped the coded responses, and as a result, we have no confidence that the "32.4%" figure, which represents the number of answers allegedly identifying Darjeeling as a "type" of tea, is accurate.[22]  However, we see no need to address these problems because the results, even if accepted as reliable, are not meaningful.  Even assuming that Dr. Block properly characterized the answers as a "type" of tea, only 32.4% of respondents gave any such answer which would mean, as even Dr. Block admitted, that the "majority" of respondents, nearly 68%, did not think of Darjeeling merely as a type of tea.  (Test., p. 14.)

---

[22] Apart from the many issues we have concerning Dr. Block's characterization of any given answer as a "type" of tea, even if the respondents themselves actually thought of Darjeeling as a "type" of tea or actually used the word "type" in their answers, there is no way of knowing what the respondents understood the word "type" to mean, that is, whether they understood the word to mean a product brand or source, or a product genus.  For example, we cannot determine whether the 34 respondents who gave the answer "black tea" viewed Darjeeling (which is a black tea) as a type of black tea from a particular place or a type of black tea regardless of where it comes from.

Third, applicant apparently expects us to infer that Darjeeling is generic from the results which, according to applicant, show that most people do not know the tea comes from Darjeeling and/or that they think it comes from someplace other than Darjeeling. Even assuming what applicant says is true, which we do not, it would at most mean that the term does not indicate a single geographic source, or that consumers' association with the geographic place is not particularly strong. See *Wallpaper*, supra at 333 ("The Board's view that there is no trademark 'when a mark loses its capacity to point out uniquely the single source or origin of goods,' that is, unless one maintains *exclusivity* of rights, is...simply 'bad law.'") (Emphasis in original.) Compare, e.g., *Fontina*, supra (finding that FONTINA identifies a type of cheese because of the evidence showing use on similar products coming from other geographic areas *and* because of evidence of use in a generic manner.)

Fourth, it is not reasonable to conclude from the survey that those who did not identify Darjeeling as a tea from India did not know it was a tea from India. As opposer points out, even applicant's own expert Dr. Block admitted (Test., p. 15) that it would be speculative to conclude from the results that the respondents did not say the tea is from India because they did not know or believe it was from India.

Simply put, applicant's survey fails to either show or support an inference that the primary significance of DARJEELING is generic.

*Dictionary Definitions*

Applicant submitted dictionary listings showing that Darjeeling is defined in The *American Heritage Dictionary of the English Language* (4th ed.) as "A fine variety of black tea grown especially in the northern part of India"; in *Merriam-Webster OnLine* as "a tea of high quality grown especially in the mountainous districts of northern India"; and in *Webster's New Collegiate Dictionary* (1977) as "a tea of high quality grown esp. in the mountainous districts of northern India." According to applicant, these definitions show that the tea is "especially, but not exclusively" from the Darjeeling region of India. Applicant concludes that the meaning of Darjeeling is therefore generic.

Opposer, in response, submitted a definition of "especially" as meaning "specifically," as well as dictionary listings showing unqualified references to Darjeeling as a tea from that region as follows: *The New Oxford American Dictionary* ("a tea grown in mountainous areas around the town of Darjeeling"); *The New Lexicon Webster's Dictionary of the English Language* ("a town...in W. Bengal, India, on the slopes of the Himalayas, a health resort and a center of the tea industry"); *Random House*

39

*Compact Unabridged Dictionary* ("a type of tea grown in mountainous areas around the town of Darjeeling"); and *The Great Family Encyclopedic Dictionary* ("resort city in N.E. India, in the foothills of the Himalayas. ~ tea, fine black tea grown there"). In addition, opposer points to *Institut*, supra, wherein the Board recognized COGNAC as a certification mark for geographic origin notwithstanding the existence of a dictionary definition of the term acknowledging "loose" misuse of the term in connection with "any good brandy."

The dictionary definitions submitted by applicant fail to show that Darjeeling has a generic meaning. They do not show that Darjeeling refers only to a type of tea, or even to a tea that may be grown somewhere other than Darjeeling, India. The definitions referring to "especially" are at worst ambiguous, as that term could be interpreted to mean "specifically," as opposer points out, and they fail to detract from the meaning of Darjeeling as a geographic source for tea. In any event, a number of the dictionaries reference Darjeeling as the exclusive geographic source of tea from that region.

### *Media Usage*

Applicant has introduced no evidence of generic use of DARJEELING by the media. Opposer, on the other hand, has introduced a number of materials that show recognition of DARJEELING solely as a term indicating tea from that region,

40

including books, newspaper articles, trade publications, Internet articles, websites of third-party tea companies, as well as applicant's own website.[23]

We also note that, while not determinative, Darjeeling is always capitalized in these references. Applicant has not pointed to, nor have we seen, a single instance of use of Darjeeling in a lower case letter "D" which may signify use in the manner of a generic designation. See, e.g., *Zimmerman*, supra at 1434 ("'Realtor' is capitalized and used in a manner consistent with respondent's position that this term functions as an identifier for its members, not as a generic designation for all real estate agents"); and *Fontina*, supra (noting lower-case treatment of "fontina" by reference materials to name a kind of cheese with certain characteristics regardless of regional origin).

Applicant's contention that opposer's evidence only shows use of Darjeeling by the trade is not altogether true, and moreover, even if true, is not significant. Applicant has the initial burden of demonstrating that the mark is generic, and applicant has failed to carry that burden.

---

[23] We note, too, as opposer points out, that the USPTO website's information on geographical indications lists DARJEELING along with other geographical indications. However, the mark is listed on the website as an example of a registered mark indicating geographic origin.

*Conclusion*

There is insufficient probative evidence in the record to establish that the DARJEELING word mark is generic. Accordingly, the counterclaim for cancellation of Registration No. 2685923 is dismissed.

**LIKELIHOOD OF CONFUSION**

We turn now to the question of likelihood of confusion between applicant's trademark DARJEELING NOUVEAU for tea and opposer's certification marks DARJEELING and the mark shown below, both used to certify tea from Darjeeling, India.[24]



Opposer introduced, by notice of reliance and also during the testimony deposition of Mr. Krishna, a status and title copy of the registration for its logo mark.[25] The registration for the

---

[24] In our analysis we keep in mind that Registration No. 2685923 for the word mark DARJEELING, and the unchallenged Registration No. 1632726, for the logo mark, are valid certification marks and are entitled to all the presumptions of validity. Therefore, for purposes of this analysis, any evidence or arguments that constitute a collateral attack on either of the registered marks will not be considered.

[25] The Board takes judicial notice of the current status of this registration and specifically that the registration was renewed on June 30, 2001. See TBMP §704.03(b)(1)(A) (2d ed. rev. 2004) (when a

word mark is of record by virtue of the counterclaim brought by applicant.[26]  See Trademark Rule 2.122(b).  Cf. Allied Mills, Inc. v. Kal Kan Foods, Inc., 203 USPQ 390, 396 (TTAB 1979) ("if the counterclaim fails, opposer's registered mark is entitled to all of the presumptions of §7(b) of the statute" including ownership of the mark and validity of the registration).  Therefore, opposer's standing has been established, and its priority with respect to these registered marks is not in issue.  King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  Thus, we turn to the question of likelihood of confusion.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue, including the similarities or dissimilarities between the marks and the similarities or dissimilarities between the goods.  In re

---

registration owned by a party has been properly made of record, and there are changes in the status of the registration between the time it was made of record and the time the case is decided, the Board will take judicial notice of, and rely upon, the current status of the registration as shown by the records of the USPTO).

[26] Opposer did not testify as to the ownership and validity of this registration and opposer introduced only a plain copy of the registration by notice of reliance along with a printout of the registration from the USPTO's electronic TRAMII system.  As indicated earlier, the parties had stipulated to the "admissibility and authenticity" of the documents and materials submitted by notice of reliance but not to the truth of the matters therein.

E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

The test for determining likelihood of confusion with respect to certification marks is the same as that applied to trademarks, i.e., the du Pont analysis. However, because the certification mark owner does not itself use the mark, the question of whether there is a likelihood of confusion is based on a comparison of the mark as applied to the goods of the certification mark users. See DuPont v. Yoshida 393 F.Supp 502, 185 USPQ 597 (E.D.N.Y.) ("...proximity [of products] may be measured against that of the certification mark user..."); and *McCarthy*, supra at §19:92.1 (4th ed. 2006) ("likelihood of confusion is measured by the related nature of the goods used by the certification mark users"). See also Jos. S. Cohen & Sons Co. v. Hearst Magazines, 220 F.2d 763, 105 USPQ 269 (CCPA 1955); and *Community of Roquefort v. William Faehndrich, Inc.*, supra. Other issues relating to the goods, including the channels of trade and purchasers for the goods are determined from the standpoint of the users as well.

*Goods, channels of trade, purchasers*

Opposer argues that the goods are identical; that as a licensed seller of Darjeeling tea, applicant is within the Tea Board's very channel of trade and sells to precisely the consumers the Tea Board expects to protect; and that, as

44

indicated in *Institut*, applicant's use of its mark in connection with genuine, certified product is irrelevant to the determination of likelihood of confusion.

Applicant argues that purchasers of applicant's tea could not be confused as to origin because, unlike *Institut*, where Cognac was just a component of the defendant's entire product, applicant's goods consist entirely of Darjeeling tea. Applicant argues that the Board in *Institut* did not hold that the certification status of applicant's goods is irrelevant, and to the extent that it does, the case was "wrongly decided." (Brief in Opp., p. 11.) It is applicant's view that while the genuineness of the product may not be dispositive of the question of likelihood of confusion, it is a relevant consideration. Accordingly, applicant has offered to amend the description of its goods to read "tea entirely from the Darjeeling region of India" to distinguish this case from *Institut* where the applicant's goods were not entirely certified goods.

While admitting the channels of trade overlap, applicant argues that they are not identical in that opposer's certified goods have much broader distribution than applicant's goods. Applicant contends that most of opposer's certified goods "apparently move in wholesale distribution" whereas applicant's goods move "almost entirely" in retail channels of trade. (Brief in Opp., p. 14.)

The parties' marks are used on identical goods - tea. Because the goods are identical and there are no restrictions in the identification of goods, the channels of trade as well as the purchasers for such goods are deemed identical. It is not significant, either in law or fact, that the channels of trade for opposer's certified tea may actually be broader than applicant's channels of trade. To the extent the channels of trade and purchasers overlap, they are in part identical. In any event, the question of likelihood of confusion is based on the goods as identified in the application and registrations regardless of what the record may show as to the actual channels of trade or purchasers for the goods. See CBS, Inc. v. Morrow, 708 F.2d 1579, 218 USPQ 198 (Fed. Cir. 1983). We must assume that applicant's tea and the tea of opposer's certification mark users are sold in the same channels of trade, including all the usual retail outlets for tea and to all the same purchasers, including ordinary purchasers. Moreover, it is reasonable to assume that ordinary purchasers of tea are not necessarily discriminating or knowledgeable about those products. Given the inexpensive nature of many teas, as shown by applicant's own evidence, ordinary purchasers would not necessarily be likely to exercise the high degree of care necessary to prevent confusion.

Applicant's reliance on and interpretation of *Institut* is simply incorrect and its arguments miss the point. The Board

specifically rejected the theory that the use of certified goods would constitute a defense to a certification mark owner's Section 2(d) claim. See *Institut*, supra at 1891. In fact the Board held "as a matter of law" that in a case involving a certification mark "the traditional du Pont likelihood of confusion analysis is applicable" and "as in any other Section 2(d) case ... includes likelihood of confusion as to source, sponsorship, affiliation, or connection."[27] *Institut*, supra at 1891; and also at 1890 (pointing out that there is nothing in the language of Section 2(d) and otherwise no authority for treating certification marks differently from trademarks, or for affording them a lesser scope of protection). When a user's goods are not genuine or do not meet the certifier's standards, it may provide additional support for a Section 2(d) claim. See, e.g., Bureau National Interprofessionnel Du Cognac v. International Better Drinks Corp., 6 USPQ2d 1610, 1617 (TTAB 1988) (finding that the mark COLAGNAC so resembled the certification mark COGNAC "as to be likely, when applied to the goods of the applicant, to cause confusion, mistake, or deception among purchasers, that is, to cause them to mistakenly believe that applicant's product is, or contains, authentic 'COGNAC' brandy (i.e., brandy which has been

---

[27] Following applicant's line of reasoning, any trademark licensee would be entitled to register the trademark owned by the licensor (or for that matter, applicant would be entitled to register the mark DARJEELING as a trademark for tea), provided the product is genuine.

47

certified by opposer Bureau as having been produced from grapes grown in the Cognac region of France in accordance with French laws and regulations.)"). In contrast, the fact that a user's products may be genuine, whether in whole or in part, is simply irrelevant, and is not a defense to a likelihood of confusion claim. See, e.g., Societe Des Produits Nestle v. Casa Helvetia, Inc., 982 F.2d 633, 25 USPQ2d 1256, 1262 (1st Cir. 1992) ("A showing that the alleged infringing product suffers in quality is not necessary to prove a Lanham Act violation"); and The American Angus Association v. Sysco Corp., 829 F.Supp. 807, 25 USPQ2d 1683, 1691 (W.D.N.C. 1992) ("Even if such a certification existed, making the phrase 'certified angus beef' arguably truthful as applied to Defendants' product...[i]t is the secondary meaning of the phrase (aligning it with Plaintiff's product) which makes its use in Defendants' ads impermissible.").

To the extent that applicant expects us to consider the genuineness of its product as a mitigating, if not a dispositive, factor in the likelihood of confusion analysis, we find instead that the genuineness of applicant's product, if anything, serves to enhance an association with opposer.

Inasmuch as applicant's offer to amend its identification of goods to state that the tea is 100% Darjeeling tea was made in an effort to overcome the likelihood of confusion, and because such

48

amendment cannot overcome the likelihood of confusion, it will be given no further consideration.

It is clear that if these identical goods are offered under similar marks there would be a likelihood of confusion. We turn then to the marks, keeping in mind that when marks would appear on identical goods, the degree of similarity between the marks necessary to support a finding of likely confusion declines. Century 21 Real Estate v. Century Life, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

*Fame or relative strength of opposer's marks*

*DARJEELING word mark:* Opposer contends that the mark DARJEELING is famous, or at least that there is a strong association among consumers of DARJEELING with tea from that region. In support of this contention, opposer relies on evidence consisting of Mr. Krishna's and Ms. Ray's testimony that companies have been importing and selling tea grown in the Darjeeling region of India and labeled as DARJEELING tea in the United States for about 50 years. Opposer has also relied on dictionary definitions for Darjeeling, third-party use of the mark on packaging for the teas indicating that the tea is from the Himalayan region of India; various advertisements for Darjeeling tea appearing in trade publications and references to and discussions of Darjeeling tea in books, newspaper articles, trade publications, Internet articles, and websites of third-

49

party tea companies. Opposer also points to its own activities in promoting and educating the public about Darjeeling tea. In particular, opposer testified that it regularly attends trade shows where it promotes Darjeeling tea, and also sends representatives to supermarkets throughout the United States to distribute literature and educate consumers about Darjeeling tea.

Applicant, on the other hand, argues that DARJEELING as a geographically descriptive word is weak and further that while the evidence may show that tea aficionados may equate DARJEELING with 100% tea from that region, the general public does not.

In determining the strength of a mark we consider both its inherent strength based on the nature of the mark itself and its market strength. See Freedom Card Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 77 USPQ2d 1515 (3d Cir. 2005); Brennan's Inc. v. Brennan's Restaurant LLC, 360 F.3d 125, 69 USPQ2d 1939 (2d Cir. 2004); Therma-Scan Inc. v. Thermoscan Inc., 295 F.3d 623, 63 USPQ2d 1659 (6th Cir. 2002); and H. Lubovsky, Inc. v. Esprit de Corp, 627 F.Supp. 483, 228 USPQ 814 (S.D.N.Y. 1986).

Geographically descriptive terms are generally regarded as inherently weak and entitled to less protection than arbitrary or suggestive marks. Ordinarily, a term that describes the geographic source of a product is not protectable without a showing of acquired distinctiveness. However, Section 2(e)(2) of the Trademark Act which prohibits registration of a mark that is

50

primarily geographically descriptive of an applicant's goods, provides a specific exception for marks used to certify indications of regional origin under Section 4 of the Act. Thus, the presumption that a geographic term is inherently weak does not attach to geographic terms that are used to certify regional origin. A mark that is registered on the Principal Register is entitled to all Section 7(b) presumptions including the presumption that the mark is distinctive and moreover, in the absence of a Section 2(f) claim in the registration, that the mark is inherently distinctive for the goods. See, e.g., Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964, 64 USPQ2d 1321, 1326 (10th Cir. 2002) (rebuttable presumption that the mark is inherently distinctive); and Equine Technologies Inc. v. Equitechnology, Inc., 68 F.3d 542, 36 USPQ2d 1659, 1661 (1st Cir. 1995) (holder of the mark entitled to presumption that its registered trademark is inherently distinctive). See also *McCarthy*, supra at §11:43 (4th ed. 2006) (noting that "The vast majority of courts have interpreted this section [7(b)] to mean that plaintiff in litigation is entitled to a strong prima facie presumption that its registered mark is either not 'merely descriptive' or if descriptive, that secondary meaning is presumed, which amounts to the same thing.")

Thus, we consider DARJEELING inherently distinctive as a certification mark indicating geographic origin as it inherently

identifies the geographic source of the tea.  Generally, greater protection is afforded to more distinctive marks.  See Worthington Foods Inc. v. Kellogg Co. 732 F.Supp. 1417, 14 USPQ2d 1577, 1607 (S.D. Ohio 1990) ("The inherent nature of the plaintiff's mark is relevant since the more distinctive the mark, the more likely it is that a consumer, with a general recollection of the plaintiff's mark, will draw a connection between the two parties when seeing the defendant's mark.")

With regard to the market strength of DARJEELING, the question is the extent to which the relevant public recognizes DARJEELING as a mark denoting regional origin for tea.  The relevant public in this case includes not only tea aficionados and enthusiasts, but ordinary purchasers of tea, as well.

We find that the evidence considered as a whole demonstrates that DARJEELING is a strong mark as an indicator of geographic source for tea.  The testimony shows, and there is no dispute, that Darjeeling tea has been sold in the United States for 50 years.  The testimony and other evidence of record also shows, and there is no real dispute, that DARJEELING is recognized by those in the trade and tea aficionados as a geographical indication.

On the other hand, there is also evidence that shows or from which we can infer awareness and recognition of the significance of DARJEELING by at least a significant percentage of general

consumers of tea, as well.[28]  We first note that Darjeeling has no meaning apart from its geographic meaning and all the evidence of record points to that region's association with tea, and no other products.  Darjeeling is defined in a number of mainstream dictionaries not just as a geographic place but as a place known particularly for tea from that region.  Dictionaries can be strong evidence of the commonly understood meaning of a term. See Pilates Inc. v. Current Concepts Inc., 120 F.Supp.2d 286, 57 USPQ2d 1174 (S.D.N.Y. 2000) ("Dictionary definitions, while not conclusive, reflect the general public's perception of a mark's meaning."); and Murphy Door Bed Co. v. Interior Sleep Systems, Inc., 874 F.2d 95, 10 USPQ2d 1748, 1752 (2d Cir. 1989) (dictionary definitions "are influential because they reflect the general public's perception of a mark's meaning and implication"); and *McCarthy*, supra at §12.13 ("dictionary definitions are relevant and sometimes persuasive in determining public usage.")

In addition, the record shows that there are currently at least 10 different brands of tea designated as "Darjeeling" tea

---

[28] In this case, the evidentiary value of the Internet articles, books, and third-party websites, to the extent such evidence has been offered to show consumer perception of DARJEELING, is limited, because the audience for those materials is not clear.  In addition, Mr. Krishna's testimony and opposer's other testimony concerning the Tea Board's efforts to educate consumers in supermarkets is vague and lacking in detail.  There is no evidence as to how much is expended by opposer for this activity, the extent or frequency of these activities or the extent of distribution of materials to consumers.

available on grocery store shelves, suggesting a strong market presence and demand for Darjeeling tea, and applicant itself indicates that its tea is sold in seven different states. The mark has also been publicized in general circulation newspapers such as *The New York Times* and *Chicago Tribune*.

Applicant has submitted no evidence which suggests that DARJEELING is a weak mark. As we noted earlier, there is no evidence of current uncontrolled use or misuse of DARJEELING by any third party which if it occurred might tend to weaken a mark. Nor is there any evidence of use (or registration) of DARJEELING by any third party as a trademark. We find that there is a strong association in the minds of consumers between DARJEELING and tea which comes from that region. Thus, the mark is entitled to broad protection for those goods.

*DARJEELING and design mark:* Opposer has provided little in the way of evidence of public recognition of its DARJEELING and design mark. We have Mr. Krishna's and Ms. Ray's testimony that the mark has been in use since about 1987 and Ms. Ray identified 15 companies that license the mark from opposer. However, there is no evidence of any actual use of the mark by those licensees except for applicant's use and the one other company identified by applicant, The Stash Tea Company. As to actual use by those two companies, we have no evidence of sales of tea bearing the mark or the extent of exposure of the mark to consumers.

Nevertheless, the logo mark is inherently distinctive and as such is entitled to at least a normal scope of protection.

*Similarity of the Marks*

Opposer argues that applicant's mark incorporates opposer's word mark DARJEELING in its entirety and the most prominent portion of the DARJEELING and design mark. Opposer contends that the addition of the term NOUVEAU, the French word for "new," cannot serve to distinguish the parties' marks because the term is highly descriptive of tea. In particular, opposer notes applicant's admission that NOUVEAU refers to the fact that the tea is comprised of "first flush" Darjeeling tea, which opposer explains is the first harvest of Darjeeling tea leaves, that is, the "new" crop of Darjeeling tea at the outset of every season. In support of this contention, opposer has introduced a number of French-English/English-French dictionaries translating "nouveau" as "new" and points to certain website articles which, according to opposer, show that "nouveau" has the same meaning in relation to tea as it does as in the phrase "Beaujolais Nouveau" to mean wine made from the first grape harvest.

Applicant argues that the marks are distinguishable because DARJEELING NOUVEAU is a unitary mark that "gives a single, distinct commercial impression" as a whole. Applicant argues that the only common part of the mark is the geographically descriptive and weak term DARJEELING which is disclaimed in

applicant's mark.  Applicant disputes opposer's contention that "nouveau" is commonly used to refer to the initial tea harvest of a season.[29]

*DARJEELING word mark*

We find that the DARJEELING word mark and applicant's mark, considered in their entireties, are similar in sound, appearance, meaning and overall commercial impression.  The strong and distinctive term DARJEELING is opposer's entire mark and is visually and aurally a significant portion of DARJEELING NOUVEAU.

Further, the fact that DARJEELING is disclaimed in applicant's mark does not detract from the otherwise strong similarity between the marks.  It is well settled that disclaimed matter still forms a part of the mark and cannot be ignored in determining likelihood of confusion.  See In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) (The technicality of a disclaimer in National's application to register its mark has no legal effect on the issue of likelihood of confusion.  The public is unaware of what words have been disclaimed..."); and Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570, 218 USPQ2d 390 (Fed. Cir. 1983).  Nor can the geographic descriptiveness of DARJEELING in applicant's

---

[29] We have found that DARJEELING is a valid certification mark. Therefore, applicant's arguments that the marks are not similar because of third-party misuse, unlicensed, uncontrolled, or uncertified use and other similar arguments will be given no further consideration in our likelihood of confusion analysis.

56

mark affect the scope of protection to which opposer's mark is entitled.

However, we are not persuaded that NOUVEAU is descriptive of tea. First, "nouveau" is a French word and relying on foreign language dictionaries to translate the term into English involves application of the doctrine of foreign equivalents which opposer has not addressed. Further, even assuming the term would be translated into English as "new" and considering opposer's other evidence of the meaning of "nouveau" in its untranslated form, the evidence is not convincing. While there is no dispute that applicant's tea is comprised of leaves from the "first flush" harvest, the evidence does not show that "nouveau" or "new" is the equivalent of "first flush" or that tea consumers would so perceive it when used for tea. None of the definitions submitted by opposer show that "nouveau" has any particular meaning in relation to tea. There is no evidence of the extent of tea consumers' exposure to the websites opposer relies on or of their familiarity with Beaujolais Nouveau wine or even what the term means in the context of wine, let alone in a different context, i.e., tea.[30] Even assuming tea consumers understand the meaning

---

[30] Opposer has relied on one article in particular, Tea & Coffee Trade Journal ("Have First Flush Teas Become a Victim of Their Own Success?"), to show the parallel between "nouveau" for wine and tea. This article is directed to the trade and does not reflect the views of the consuming public.

57

of "nouveau" in relation to wine, it would be a stretch to assume that tea purchasers would extend that meaning to tea.[31]

Nevertheless, we find that in view of the strength of opposer's mark and the scope of protection to which it is entitled, that the addition of the word NOUVEAU to opposer's strong and distinctive mark for the identical goods is not sufficient to distinguish the marks as a whole.  We find that the word NOUVEAU, whether translated into English or not, does not affect in any significant way the meaning or overall commercial impressions the marks convey.  Purchasers will simply assume DARJEELING NOUVEAU identifies a particular variety of tea from Darjeeling, and not a different product or a different source for the tea.

### DARJEELING and design mark

Applicant's mark DARJEELING NOUVEAU incorporates a principal feature of opposer's DARJEELING and design mark.  While the marks obviously differ in appearance, they are similar in sound, meaning and commercial impression.  One of the strongest impressions of opposer's composite mark is conveyed by the term DARJEELING.  The word is displayed prominently along the outer

---

[31] Opposer concludes in a footnote that applicant's mark is primarily geographically descriptive and registration should be denied under Section 2(e) of the Trademark Act.  This claim was not pleaded by opposer and it is not clear that it was tried by the parties, but in any event because the term NOUVEAU is not descriptive, there is no need to consider the question of whether applicant's mark is primarily geographically descriptive as a whole.

rim of the circular design and is a focal point of the mark. Further, DARJEELING is the only wording in registrant's mark and is likely to make a greater impression on purchasers and to be remembered by them than the design since it is primarily the word DARJEELING that they will rely on to identify the geographic source of the tea. Cf. In re Appetito Provisions Co., 3 USPQ2d 1553 (TTAB 1987).

Neither the design element in opposer's mark nor the word NOUVEAU in applicant's mark significantly affects the meaning or the commercial impression created by the strong and distinctive word DARJEELING. Both marks identify the same geographic source of the tea, and if anything, the image, which Ms. Ray describes as "an Indian woman holding tea leaves" (Test., p. 4) strengthens the association of DARJEELING with Indian tea. Purchasers encountering these marks at different times on the identical goods, are likely to assume that applicant and/or its brand of tea is in some way associated with, endorsed by, or otherwise connected to opposer. In fact, the two marks could conceivably appear on the very same packages of tea as applicant is a licensor of the DARJEELING and design mark, thus increasing the likelihood of confusion.

### *Intent*

We turn lastly to opposer's claim that applicant adopted the mark DARJEELING NOUVEAU in bad faith. Establishing bad faith

59

requires a showing, by a preponderance of the evidence, that applicant intentionally sought to trade on the goodwill or reputation associated with opposer's mark. See Big Blue Products Inc. v. International Business Machines Corp., 19 USPQ2d 1072 (TTAB 1991). Opposer's sole argument in this regard is that applicant, as an authorized licensee of opposer, "clearly intends to appropriate for itself the cache of the Darjeeling designation." Applicant, however, maintains that there is no license agreement between the parties for the word DARJEELING "so applicant cannot be said to be intending to trade off the goodwill of opposer."

There is no testimony or other evidence regarding applicant's intent in adopting the mark. The mere fact that applicant is a licensee of opposer's composite mark that includes the word DARJEELING does not demonstrate that applicant intended to trade off the goodwill associated with the word mark alone. In fact it appears to have been applicant's belief, however misguided, that opposer did not have any ownership rights to DARJEELING alone, and therefore no goodwill in the mark. Thus, opposer has not shown that applicant adopted the mark in bad faith.[32]

---

[32] However, the fact that opposer has not shown bad faith is not a factor that weighs in applicant's favor. We instead find that this factor is neutral in our analysis. Lack of intent to trade on or copy another's mark will not prevent a finding of likelihood of confusion if a likelihood of confusion otherwise exists. See J & J Snack Foods

*Conclusion*

We find that in view of the similarity of the marks and the strength of opposer's marks in relation to the goods, and because the goods, as well as the trade channels and purchasers for the goods are identical, confusion is likely.

In view of our decision on the issue of likelihood of confusion, we need not consider the issue of dilution.

**Decision:** The opposition is sustained, and the counterclaim to cancel Registration No. 2685923 is dismissed.

---

Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991).